UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

VS.                              CIVIL ACTION NO. 4:05CV33TSL-LRA

IKE BROWN, NOXUBEE COUNTY
DEMOCRATIC EXECUTIVE COMMITTEE;
NOXUBEE COUNTY ELECTION COMMISSION                          DEFENDANTS

MEMORANDUM OPINION AND ORDER

The United States of America brought this action against the Noxubee County Democratic Executive Committee and its chairman, Ike Brown, and the Noxubee County Election Commission[1] alleging claims under Section 2 of the Voting Rights Act, and also asserting claims against Brown and the Noxubee Democratic Executive Committee under Section 11 of the Voting Rights Act. The case was tried to the court from January 16 to January 31, 2007, following which the parties submitted post-trial briefs presenting what they contend are the factual and legal issues pertinent to the court's decision. Having considered the evidence presented and the parties' memoranda, the court makes the following findings and conclusions.

---

[1] The Government also sued Carl Mickens, individually and in his official capacity as Circuit Clerk of Noxubee County, and Noxubee County under Section 11(b) of the Voting Rights Act. A consent decree was entered with these defendants contemporaneously with the filing of the complaint so that they are no longer active parties.

The Parties:

The plaintiff is the United States Department of Justice (the Government) which brought this action pursuant to the authority granted by 42 U.S.C. § 1973j(d), which states,

> Whenever any person has engaged . . . in any act or practice prohibited by Section [2 or 11] . . ., the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction . . . or other order.

The defendants are the Noxubee County Democratic Executive Committee, its chairman Ike Brown, and the Noxubee County Election Commission. Under state law, the Noxubee County Democratic Executive Committee (NDEC) is responsible for "performing all duties that relate to qualifications of candidates for (Democratic) primary elections" and for conducting Democratic primary elections in Noxubee County. See Miss. Code Ann. § 23-15-263. Ike Brown has been chairman of the NDEC since 2000, having been elected to the position at the county convention in 1999. The Noxubee County Election Commission is responsible for conducting general elections, as well as for maintaining the county's voter registration rolls. See Miss. Code Ann. § 23-15-213. The defendants, together with the registrar, who in Noxubee County is the circuit clerk, have control over every electoral activity "from voter registration, to voter roll maintenance, to voting itself, and to canvassing returns and certifying election results." Jeffrey Jackson and Mary Miller, Mississippi Practice

2

Series: Encyclopedia of Mississippi Law § 6 (2003).  Their
authority is thus said to be "superior to that of any other
players in the process."  <u>Id</u>.  ("the local parties' role in the
conduct of the primaries is all encompassing").

The Government's Claims:

When the Voting Rights Act was passed in 1965, the population
of Noxubee County was approximately 70% black and 30% white, but
100% of the elected officials in the county were white.  Now,
forty years later, the population of Noxubee County is still about
70% black and 30% white, but 93% of elected officials are black.[2]
Four of five members of the Board of Supervisors are black; five
of five members of the Election Commission are black; five of five
members of the Board of Education are black; and with the
exception of the county prosecuting attorney, all countywide
elected officials are black, including the circuit clerk, chancery
clerk, sheriff, tax assessor, superintendent of education,
coroner, two justice court judges and two constables.  Moreover,
the Democratic party in Noxubee County, once dominated by whites,
is now majority black; and Democratic party officials in Noxubee
County, including NDEC Chairman Ike Brown and all but one of the
30 current members of the NDEC, are black.  Thus, whereas whites

---

[2]     According to the 2000 Census data, Noxubee County has a
population of 12,548, of whom 3,667 (29.2%) are white, and 8,634
(68.8%) are black.  Of the 8,697 persons of voting age, 2,826
(32.5%) are white and 5,711 (65.7%) are black.

were historically in power in this majority black county, the
tables have turned, and, as the Government's expert Dr. Theodore
Arrington has put it, "You now have a situation in which whites
are the minority and blacks are in a position to discriminate
against them very much in the same way as whites discriminated
against blacks in the history further back."  As the Government
sees it, that is precisely what has occurred and is occurring in
Noxubee County.  Accordingly, in what is an unconventional, if not
unprecedented use of the Voting Rights Act, the Government filed
this suit claiming that Noxubee County Democratic party officials
have engaged in conduct that has infringed the voting rights of
white voters, the minority group, and has denied white voters
equal access to the electoral process.

　　　In broad terms, the Government charges that defendants have
administered the Democratic primary in Noxubee County in such a
way as to discriminate against white voters and white-preferred
candidates; that the racially discriminatory way the elections are
conducted is with the purpose of diluting the voting strength of
white voters and reducing the opportunities for white voter-
preferred candidates to be elected to local office; and that the
result of this discriminatory administration of the Democratic
primary is the dilution of white voting strength, thereby denying
white voters the opportunity to elect candidates of their choice
and ensuring that the black candidates preferred by defendants

will be elected.  In short, the Government claims that defendants have intentionally practiced racial discrimination and that their actions have had the racially discriminatory result of reducing the electoral opportunities of white voters and white voter-preferred candidates.

Section 2:

Section 2 of the Voting Rights Act protects against discrimination in voting on account of race, and is the "major statutory prohibition of all voting rights discrimination."  S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 207.  Section 2 prohibits states from applying any "voting qualification or prerequisite to voting or standard, practice or procedures . . . which results in a denial or abridgment of the right of any citizens of the United States to vote on account of race or color."  42 U.S.C. § 1973(a).  A violation of Section 2 is established where, "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of [a] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).

This is an atypical Section 2 case in a number of ways, principal among which is the fact that the case involves alleged

discrimination against white voters.  Yet Section 2 provides no less protection to white voters than any other class of voters.[3] Any doubt as to this conclusion is allayed by a review of the history of Section 2.

As originally enacted, Section 2 was not considered controversial because it was viewed essentially as a restatement of the Fifteenth Amendment, which provides:  "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race," U.S. Const. amend. XV, § 1.[4]  See Mobile v. Bolden, 446 U.S. 55, 61, 100 S. Ct. 1490, 1496-97 (1980) (plurality opinion).  The Fifteenth Amendment had been enacted in the wake of the Civil War

_____

[3]   Although Brown was quoted in an August 5, 2003 article in the *Clarion Ledger* as saying he "didn't know that white voters were covered under the Voting Rights Act," in this case, he does not challenge the proposition that they are.  His attorneys argue that "[a]pplication of the facts in this case under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, does not rest easily within the contours of the leading cases interpreting the Act as amended in 1982," and about that, they may be right; but they do not dispute the broader general principle that Section 2 protects the rights of *all* voters, regardless of race, and agree that "it is generally accepted that the section prohibits all forms of voting discrimination."

[4]   As originally enacted, Section 2 provided:
No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.
42 U.S.C. § 1973.

"to guarantee to the emancipated slaves the right to vote, lest
they be denied the civil and political capacity to protect their
new freedom."  <u>Rice v. Cayetano</u>, 528 U.S. 495, 512, 120 S. Ct.
1044, 1054 (2000).  Yet as the Supreme Court acknowledged in <u>Rice</u>,
the amendment goes beyond this vital objective:

> Consistent with the design of the Constitution, the
> Amendment is cast in fundamental terms, terms
> transcending the particular controversy which was the
> immediate impetus for its enactment.  *The Amendment
> grants protection to all persons, not just members of a
> particular race.*
>
> The design of the Amendment is to reaffirm the
> equality of races at the most basic level of the
> democratic process, the exercise of the voting
> franchise.  A resolve so absolute required language as
> simple in command as it was comprehensive in reach.
> Fundamental in purpose and effect and self-executing in
> operation, *the Amendment prohibits all provisions
> denying or abridging the voting franchise of any citizen
> or class of citizens on the basis of race*
> . . .  The Court has acknowledged the Amendment's
> mandate of neutrality in straightforward terms:  "If
> citizens of one race having certain qualifications are
> permitted by law to vote, those of another having the
> same qualifications must be.  Previous to this
> amendment, there was no constitutional guaranty against
> this discrimination:  now there is."  <u>United States v.
> Reese</u>, 92 U.S. 214, 218, 23 L. Ed. 563 (1876).

<u>Rice</u>, 528 U.S. at 512, 120 S. Ct. at 1054 (emphasis added).

Consistent with <u>Rice</u>, the court in <u>United Jewish Organizations of
Williamsburgh, Inc. v. Wilson</u> concluded that white voters had
standing to bring a vote dilution claim under the fifteenth
amendment, reasoning,

> [T]here is no reason . . . that a white voter may not
> have standing, just as a nonwhite voter, to allege a

7

> denial of equal protection as well as an abridgement of
> his right to vote on account of race or color,
> regardless of the fact that the fourteenth and fifteenth
> amendments were adopted for the purpose of ensuring
> equal protection to the black person.  While we
> generally tend to think of white voters as being in the
> majority because in the country as a whole and in most
> states they are, it is plain enough that in a given
> state or political subdivision they may not be; to the
> extent that the fourteenth and fifteenth amendments can
> be construed as extending the rights of minority groups,
> in a given situation that group may of course be white.

510 F.2d 512, 520 (2d Cir. 1975), aff'd sub nom., United Jewish

Org.'s of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S. Ct.

996 (1977).  See also Enlargement of Boundaries of Yazoo City v.

City of Yazoo City, 452 So. 2d 837, 843 (Miss. 1984) ("A person

does not have to be a member of any particular race or group in

order to have his right to vote respected.  White persons have the

same constitutional and legal immunity against the abridgment of,

or dilution of, their right to vote on account of race and color

as do black persons.").

    The Supreme Court has recognized that the coverage provided

by Section 2, as originally enacted, "was unquestionably

coextensive with the coverage provided by the Fifteenth Amendment;

the provision simply elaborated upon the Fifteenth Amendment."

Chisom v. Roemer, 501 U.S. 380, 391-92, 111 S. Ct. 2354, 2362

(1991); see also Bolden, 446 U.S. at 60-61, 100 S. Ct. at 1496

("[I]t is apparent that the language of § 2 no more than

elaborates upon that of the Fifteenth Amendment and the sparse

legislative history of § 2 makes it clear that it was intended to

8

have an effect no different from that of the Fifteenth Amendment itself.").[5]  It follows, then, that Section 2 was intended to protect the rights of *all* voters, regardless of race.  See White v. Alabama, 74 F. 3d. 1058, 1073-74 (11th Cir. 1996) (finding that right of class of "non-black voters" to be free from racial discrimination, as protected by Section 2, was violated by a settlement agreement which racially apportioned state judicial offices).  While Section 2 was amended in 1982, the amendment was intended "to broaden the protection afforded by the Voting Rights Act," not constrict the Act's coverage.  Chisom, 501 U.S. at 404, 111 S. Ct. at 2368.  See also Hayden v. Pataki, 449 F.3d 305, 353 (2d Cir. 2006) (stating that "from its inception and particularly through its amendment in 1982, Congress intended that § 2 . . . be given the broadest possible reach").  From the foregoing, it is manifest that Section 2 broadly protects the voting rights of all voters, even those who are white.

---

[5]      Prior to the Supreme Court's decision in Bolden, "there was relatively little judicial interpretation of section 2. Rather, most courts chose to deal exclusively with the constitutional standards, probably under the assumption that the standard under section 2 was equivalent."  McMillan v. Escambia County, Fla., 748 F.2d 1037, 1042 n.9 (5th Cir. 1984) (citations omitted).  Bolden "tied the two standards together," and found that a Section 2 claim "added nothing" to the claim of a Fifteenth Amendment violation.  Id. (citing Bolden, 446 U.S. at 60-61, 100 S. Ct. at 1496).

This case also differs from the majority of more recent Section 2 cases in that the Government is not merely claiming that defendants have engaged in racially neutral activities that have *resulted* in discrimination; rather, it is claiming that defendants have engaged in intentional, purposeful racial discrimination against white voters.

In <u>Bolden</u>, the plurality opinion held that there was no violation of either the Fifteenth Amendment or Section 2 absent proof of intentional discrimination.  446 U.S. at 60-61, 100 S. Ct. at 1496.  Responding to the Court's holding, Congress amended Section 2 in 1982 to eliminate any requirement of a purpose or intent to discriminate and to provide that proof of discriminatory results or discriminatory impact is sufficient.  <u>Chisom</u>, 501 U.S. at 392-93, 111 S. Ct. at 2362-63.  Following the 1982 amendment,

> "[P]laintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation.  Plaintiffs must prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process."

<u>McMillan v. Escambia County, Fla.</u>, 748 F.2d 1037, 1046-1047 (5th Cir. 1984) (quoting S.Rep. No. 97-417, 205).  <u>See also Garza v. County of Los Angeles</u>, 918 F.2d 763, 766 (9th Cir. 1990) ("[T]he Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting

minority votes."); <u>Dillard v. Town of North Johns</u>, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989) ("[A] violation of § 2 of the Voting Rights Act is established if action was taken or maintained with a racially discriminatory 'intent' or the action has racially discriminatory 'results,' determined according to certain congressionally approved criteria").

Most Section 2 cases brought since the 1982 amendment have been "results" cases, rather than "intent" cases, so there are few cases addressing the specific proof requirements in intent cases in the wake of the 1982 amendment.  In any Section 2 case, the burden is on the plaintiff to prove that the challenged situation constituted a qualification, prerequisite, standard, practice, or procedure within the meaning of Section 2, and based on the "totality of the circumstances," that the challenged practice has resulted in members of a protected class having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." <u>United States v. Jones</u>, 57 F.3d 1020, 1023 (11th Cir. 1995) (quoting Section 2, and citing <u>Thornburg v. Gingles</u>, 478 U.S. 30, 79-80, 106 S. Ct. 2752, 2781 (1986)).  The inquiry into the "totality of circumstances" is guided by a number of factors set forth in the Senate Report accompanying the 1982 amendment, which in "results" cases, function as "signals of diminished opportunity for political participation of the minority group and election of

11

the representatives of their choice." <u>See</u> <u>League of United Latin</u>

<u>American Citizens, Council No. 4434 v. Clements</u>, 986 F.2d 728,

844-45 (5th Cir. 1993).  The Senate factors include:

> a. the extent of any history of official discrimination
> in the state or political subdivision that touched the
> right of the members of the minority group to register,
> to vote, or otherwise to participate in the democratic
> process;
> b. the extent to which voting in the elections of the
> state or political subdivision is racially polarized;
> c. the extent to which the state or political
> subdivision has used unusually large election districts,
> majority vote requirements, anti-single shot provisions,
> or other voting practices or procedures that may enhance
> the opportunity for discrimination against the minority
> group;
> d. whether members of the minority group have been
> denied access to [any candidate slating] process;
> e. the extent to which members of the minority group in
> the state or political subdivision bear the effects of
> discrimination in such areas as education, employment
> and health, which hinder their ability to participate
> effectively in the political process;
> f. whether political campaigns have been characterized
> by overt or subtle racial appeals;
> g. the extent to which members of the minority group
> have been elected to public office in the jurisdiction;
> h. whether there is a significant lack of responsiveness
> on the part of elected officials to the particularized
> needs of the members of the minority group; [and]
> i. whether the policy underlying the state or political
> subdivision's use of such voting qualification,
> prerequisite to voting, or standard, practice or
> procedure is tenuous.

<u>Magnolia Bar Ass'n, Inc. v. Lee</u>, 994 F.2d 1143, 1147 (5th Cir.

1993) (quoting S. Rep. No. 97-417, at 206-07).[6]  In a results

---

[6]     The first seven factors set forth in the Senate Report
are essentially the same factors as developed by the Fifth Circuit
in <u>Zimmer v. McKeithen</u>, 485 F.2d 1297 (5th Cir. 1973) (en banc),
<u>aff'd per curiam sub nom.</u> <u>East Carroll Parish School Board v.</u>
<u>Marshall</u>, 424 U.S. 636, 96 S. Ct. 1083 (1975), as factors to be

case, these factors tend to show whether and to what extent a challenged practice has affected minority voters' participation in the political process.

"Claims of intentional discrimination under Section 2 are assessed according to the standards applied to constitutional claims of intentional racial discrimination in voting," United States v. Charleston Cty., 316 F. Supp. 2d 268, 272 (D.S.C. 2003) (citing Garza, 918 F.2d at 766), and while the Senate factors, or some of them, may still be relevant in such cases, they "serve a different purpose in litigation under section 2 from their purpose in constitutional litigation," McMillan, 748 F.2d at 1043 n.11 (quoting United States v. Marengo County Comm'n, 731 F.2d 1546, 1564-66 (11th Cir. 1984)). "[I]f a section 2 plaintiff chooses to prove discriminatory intent, 'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions' would be relevant evidence of intent." McMillan, 748 F.2d at 1046-47 (quoting S. Rep. 97-417, 205 n.108). "Where direct evidence of discriminatory motive is proffered, a case is easily made, ... as it is where the circumstantial evidence of racially discriminatory motivation is

---

considered in vote dilution cases. United States v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir. 1984), appeal dismissed, cert. denied, 469 U.S. 976, 105 S. Ct. 375 (1984)). These are often referred to as either or both the "Senate factors" and the "Zimmer factors." The final two factors were identified as additional factors that may in some cases have had probative value to establish a violation. S.Rep. No. 97-417, 207.

so strikingly obvious that no alternative explanation is plausible." Nevett v. Sides, 571 F.2d 209, 221-222 (5th Cir. 1978). Because such cases are rare, courts must usually look to other evidence. Id. In an intent case, the Senate factors may provide such "other evidence" of a discriminatory purpose. McCarty v. Henson, 749 F.2d 1134, 1136 (5th Cir. 1984) ("The existence of the Zimmer factors might be indicative, though not conclusive, of discriminatory purpose"). See also Rogers v. Lodge, 458 U.S. 613, 620, 102 S. Ct. 3272, 3277 (1982) (agreeing that "although the evidentiary factors outlined in Zimmer [are] important considerations in arriving at the ultimate conclusion of discriminatory intent, the plaintiff is not limited to those factors").

> For example, "[a] history of discrimination is important evidence of both discriminatory intent and discriminatory results," because "[a] history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination." Under the results test, the inquiry is more direct: past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs.

Marengo County Com'n, 731 F.2d at 1567 (citing Zimmer, 485 F.2d at 1306). Circumstantial evidence of discriminatory intent may also be found to exist in the form of starkly differential racial

impact; the historical background of the practice, "particularly if it reveals a series of official actions taken for invidious purposes"; the "specific sequence of events leading up to the challenged decision"; procedural or substantive departures from normal decision-making; and statements, including legislative or administrative history, reflecting on the purpose of the decision. Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 564 (1977) (cited in Nevett, 571 F.2d at 221-222).

A final wrinkle here is that unlike most Section 2 cases, which have involved "entrenched electoral practices" such as at-large elections or existing district voting plans, this case involves episodic, or "one of a kind" practices. Nevertheless, it is clear that Section 2 "prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members." S. Rep. No. 97-417, at 207. See also Welch v. McKenzie, 765 F.2d 1311, 1315 (5th Cir. 1985) (Section 2 "covers episodic practices, as well as structural barriers, that result in discrimination in voting"); Ortiz v. City of Philadelphia Office of City Com'rs Voter Registration Div., 824 F. Supp. 514, 521-522 (E.D. Pa. 1993)(scope of Section 2 "includes all electoral practices that deny minority voters equal opportunity to participate in any phase of the political process

15

and to elect candidates of their choice, even if the challenged
practice is episodic rather than involving a permanent structural
barrier infringing upon the right to vote"); <u>Goodloe v. Madison
County Bd. of Election Com'rs</u>, 610 F. Supp. 240, 243 (S.D. Miss.
1985) ("Section 2 on its face is broad enough to cover practices
which are not permanent structures of the electoral system but
nevertheless operate to dilute or diminish the vote of blacks").[7]
However, the Senate Report notes that "[i]f the challenged
practice relates to . . . a series of events or episodes, the
proof sufficient to establish a violation would not necessarily
involve the same factors as the courts have utilized when dealing
with permanent structural barriers."  S. Rep. No. 97-417, at 207.
Taking their cue from this comment, most of the relatively few
courts that have addressed alleged episodic violations of Section
2 generally have not applied the Senate factors.  <u>United States v.
Jones</u>, 846 F. Supp. 955, 964 (S.D. Ala. 1994) (citing <u>Welch</u>, 765
F.2d 1311, and <u>Brown v. Dean</u>, 555 F. Supp. 502 (D.R.I. 1982)).
"Whether these factors are considered or not, however, 'the
ultimate test would be . . . whether, in the particular situation,

---

[7]    Examples of such episodic practices have included
disparate purging of black voters from voter registration rolls,
<u>Toney v. White</u>, 488 F.2d 310 (5th Cir. 1973) (<u>en banc</u>); disparate
treatment of absentee ballots, <u>see</u> <u>Goodloe v. Madison County Bd.
of Election Com'rs</u>, 610 F. Supp. 240, 243 (S.D. Miss. 1985), and
<u>Brown v. Post</u>, 279 F. Supp. 60 (W.D. La. 1968); and refusal to
appoint minority registration and election officials, <u>Harris v.
Siegelman</u>, 695 F. Supp. 517, 527 (M.D. Ala. 1988).

the (episodic) practice operated to deny the minority (plaintiff) an equal opportunity to participate and to elect candidates of their (sic) choice.'"  Id. (quoting S. Rep. No. 97-417, at 30); Welch, 765 F.2d at 1315 (5th Cir. 1985).

The court is convinced that Ike Brown, and the NDEC under his leadership, have engaged in racially motivated manipulation of the electoral process in Noxubee County to the detriment of white voters.

A Racial Agenda:

The court has not had to look far to find ample direct and circumstantial evidence of an intent to discriminate against white voters which has manifested itself through practices designed to deny and/or dilute the voting rights of white voters in Noxubee County.  The court is hesitant to find that Ike Brown, or any member of the NDEC, has a specific racial animus against whites.  Brown, in fact, claims a number of whites as friends.  However, there is no doubt from the evidence presented at trial that Brown, in particular, is firmly of the view that blacks, being the majority race in Noxubee County, should hold all elected offices, to the exclusion of whites; and this view is apparently shared by his "allies" and "associates" on the NDEC, who, along with Brown, effectively control the election process in Noxubee County.  This is a view that Brown has expressed publicly and privately over the years, and one that has been the primary driving force in his

17

approach to all matters political since his first involvement in Noxubee County politics in the 1970s.

A Brief History:

At the time the Voting Rights Act was passed in 1964, there were no black elected officials in Noxubee County and only a small number of the county's black population were registered to vote. This began to change when federal registrars came to Macon, the county seat, in 1968 to register voters.  The year 1971 saw the county's first black candidates on the ballot, and the first black elected official, Joseph Wayne, who won a seat on the Board of Supervisors.

Ike Brown first became involved in Noxubee County politics in 1977 when he worked in the campaign of William Dantzler, a black candidate for supervisor.  At the time of the Dantzler campaign, Brown was living in Madison County but he eventually moved to Noxubee County in 1979 to help black candidate Reecy Dickson in her bid for election as superintendent of education.  Dickson's election to this countywide office, as defendants put it, was "the first major crack in the wall of white dominance in county elective offices."

The 1980s brought a sea change in the political landscape of Noxubee County.  More and more blacks were running for office and blacks began going to the polls in increasing numbers.  Brown was active throughout these years in support of black candidates and

18

the cause of blacks taking control, and as blacks steadily gained power, so did Brown gain influence in the black community.  By the mid-1990s, blacks held the majority of elected positions in the county.

Defendants readily admit that Brown has been the most vocal, opinionated and controversial political figure in Noxubee County, and they do not deny that he has promoted a racial agenda.  For example, in a 1995 letter authored by Brown while in federal prison on a conviction for income tax fraud, Brown addressed the county's black voters:

TO THE BLACK VOTERS OF NOXUBEE COUNTY

Lest We Forget

> We are not free yet.  As I am imprisoned, so could you, but in a different manner.  They thought by getting rid of me they could fool you.  Don't let them carry you back to the old days, when blacks were found dead in the jail, you couldn't even go in the courthouse, you weren't even respected, I help bring change to Noxubee County, and I will be back soon.  You must win this one yourself.  I am asking you to remember me by supporting these candidates who have pledge to keep the dream alive. . . .

After then presenting a slate of all black candidates, Brown concluded:

> Please support these candidates.  As Jessie Jackson said, "Keep Hope Alive Vote Black in '95'."[8]

---

[8]    Although he does not deny that it more or less accurately reflected his views, Brown denies that he wrote this letter.  The court is convinced that he did.

Similar racially-based encouragement had been offered by Brown to black voters at one polling place in 1994.  As related by Judith Ann Ewing, a white bailiff at the Democratic table at the Title 1 polling place, Brown entered the polling place and, speaking loudly, announced (to the blacks) in the room, "You've got to put blacks in office, our candidates, because we don't want white people over us anymore."

At the same time he was publicly appealing to black voters to "vote black" and put "our candidates" in office, Brown was privately recruiting and counseling black candidates about the importance of defeating white candidates and of black officials governing the county.  David Boswell, who is black, testified that in 1995, Brown asked him to a meeting to discuss Boswell's candidacy for District 5 supervisor.  According to Boswell, at the meeting, attended only by blacks, Brown told him he was looking for a "good black candidate," expressed concern that a white candidate might win the position, and told him that since the county was predominately black, all county officials should be black.  Brown told Boswell, "We want to keep this thing as black as possible."  Similar testimony was presented from Larry Tate, the current member of the Board of Supervisors for District 1, who is also black.  Tate reported that when he ran for chancery clerk in 1991 and again in 1995, Brown told him he wanted a black to be elected to the position since the county was predominately black.

Brown was also openly critical of blacks he saw as supporting white candidates and/or working with whites.  In the early 1990s, for example, during a particularly divisive debate in the county over the efforts of Federated Technologies, Inc. (FTI), Brown, who supported FTI, criticized John Gibson, another black man, for making an "alliance" with the whites (the majority of whom opposed FTI).  And in a 1998 meeting of the Board of Supervisors in which black supervisor William "Boo" Oliver voted, along with Eddie Coleman, a white supervisor, to fire two black justice court clerks who were accused of stealing, Brown accused Oliver of being "a white man's nigger" and "selling out to the white folks."[9] Brown made this accusation, notwithstanding that the motion to terminate the employees had been made by another black supervisor, Robert Henley, and two of the three members of the Board voting for the terminations were black.

In 1999, another letter from Brown, in which he identified himself as "Chairman, Noxubee County Voters League," was published in the *Macon Beacon*, directed to "the voters of Noxubee County," but the substance of which was directed to black voters, in which Brown wrote:

---

[9]    According to an article in the *Macon Beacon* recounting the incident, before focusing his anger on Oliver, Brown had first asked Eddie Coleman, loudly, "You don't think you owe anything to black people?"  There was evidence that in previous Board meetings, Brown had accused Coleman of being racist, and had asked Coleman, in a public board meeting, whether Coleman "ever used the 'N' word."

> Three years ago, Marzine Robinson (Soul) was sentenced to 35 years in prison for selling a rock of cocaine less than one ounce. Two years later, a whole field of dope was found on the property of two white public officials, Judge Sherlene Boykin and Supervisor Eddie Coleman. Nothing was done, but you can do something -- vote both of them out of office.
>
> Saturday, July 10th, a representative for Forrest Allgood, District Attorney, was at a political rally in Macon. When questioned as to why no blacks had ever been hired to work for Forrest, he replied, "None are good enough." Remember, if none are good enough for him, then he is not good enough for our vote.

Brown identified black candidates for each of the positions of

justice court judge, supervisor District 4 and district attorney,

and concluded,

> [R]emember, I will be at the polls in Shuqualak all day, so stand with me and I will stand with you, and may God bless you.

When Brown wrote this letter, Boykin, Coleman and Allgood were

among the few remaining white elected officials in Noxubee County

and the few whites running for election. Brown wanted them out of

office and used racial appeals to "get the job done."[10]  In fact, a

representative of Forrest Allgood had not said that blacks were

not "good enough" to work in the district attorney's office; this

was instead Brown's spin on the representative's statement,

conveyed in a manner which was calculated to inflame black voters.

And while there were rumors that marijuana had been found on

---

[10]   Phillip McGuire, who is white and the chairman of the Macon Democratic Executive Committee, testified that when he recently asked Brown why he had made racial statements over the years, Brown responded that he used race "to get the job done."

property owned by Boykin and Coleman, there was nothing to suggest that either official was aware of or had any involvement in this alleged discovery, but more pertinently, there was no reason for Brown to have identified Boykin and Coleman in the letter as "white" public officials other than to raise the ire of black voters and galvanize black opposition to these "white" officials.[11]

All of these remarks and incidents--Brown's letters and declarations to black voters, his statements to Tate and Boswell, his chastisement of Gibson and racial slurs against Oliver-occurred prior to Brown's ascent to the chairmanship of the NDEC and have not been suggested by the Government to have violated Section 2.  Indeed, as an individual, Brown was free to promote his racial views and agenda among the electorate with impunity.  See Welch, 765 F.2d at 1316 ("Section 2 only affords redress for voting practices "imposed or applied by any State or political subdivision").[12]  However, Brown's comments and actions predating his tenure as NDEC chairman present a clear picture of Brown's racial agenda and, to the extent it might otherwise be

---

[11]    Brown's explanation was that his only intent was to identify Boykin and Coleman as part of the "establishment."  This could have been accomplished by identifying them simply as "public officials," yet he made a point to identify them as "white public officials."  His explanation is not believable, particularly given that the "establishment" in Noxubee County at the time was mostly black.

[12]    It is undisputed that the actions of the NDEC and Brown as chairman of NDEC constitute state action.

unclear, give context and meaning to his actions as NDEC chairman. This agenda did not change when he assumed his duties as chairman of the NDEC in 2000 following his election to the position at the 1999 county convention.[13]  What did change was Brown's ability to affect the electoral process in a much more direct fashion.

Recruitment of Black Candidates:

The credible evidence plainly establishes that, among other actions Brown took once he became NDEC chairman in an effort to further his racial agenda, Brown attempted to recruit black candidates to run for offices for which he knew they were not qualified according to state residency requirements.  Although he denies having done so, the court finds that prior to the 2003

_____

[13]    Indeed, not long after he became chairman, Brown attended a meeting of the Board of Supervisors addressed to the subject of redistricting in the wake of the 2000 Census, and proposed adoption of a plan in which all the districts were drawn so that blacks could win in all five districts, and which specifically advocated moving more blacks into District 5, the only district with a white incumbent, Eddie Coleman, for the express purpose of improving the opportunity for a black to be elected.  Obviously, merely advocating a plan for redistricting does not violate Section 2; but Brown's position on redistricting is more evidence of his racial motivation.  Commenting on the implications of Brown's remarks to the Board, Dr. Arrington, the Government's expert, aptly observed:

> Suppose we had a majority white county where four of the five county commissioners were white and about 30 percent of the population was black and you had a white party official come and say, "I want you to make the one district that elects a minority representative, I want you to make it much whiter so that the black representative will have a more difficult time."  I think we would say right away, "Wait a minute, that sounds like an intent to discriminate," and I think that's exactly what you have here.

24

Democratic primary, Brown encouraged a black attorney, Winston Thompson, whom he knew to be a nonresident of Noxubee County, to run against the white incumbent, Ricky Walker, for the office of county prosecuting attorney, the only countywide elected office held by a white.[14]  In so doing, race was Brown's sole motivation: He wanted to find a black candidate who could unseat the white incumbent.[15]  After learning of Thompson's candidacy, Walker began inquiring about him and determined that Thompson was not a resident.  He learned, for example, among other things, that while

---

[14]     Under Mississippi law, to be qualified to run for county prosecuting attorney, a person must be a resident of the county in which he proposes to run.  The court notes that even if Brown did not actively recruit Thompson and Thompson made the decision on his own to seek the office, Brown certainly knew that Thompson was a nonresident of Noxubee County and that as such he was not qualified to run for office.

[15]     An April 4, 2006 article by Bill Nichols in *USA Today* reported Brown as noting that Noxubee County has only one countywide elected official, prosecutor Ricky Walker, and saying, "If I could find a black lawyer who lives in the county, we'd get him, too."  Even without evidence of this statement, the court would find that Brown's motivation in recruiting Thompson was racial.

Defendants point out that in the preceding sentence in that same article, Brown is reported to have also said "he has no problem supporting whites for office — he campaigned for current Macon Mayor Bob Boykin, who is white."  The court finds little probative value in Brown's support of Boykin's mayoral campaign given that it came at a time after this lawsuit was filed and thus at a time when Brown's motivation may have shifted somewhat in light of changed circumstances.  Indeed, at the same time he was expressing his public support of Boykin, Brown was secretly trying to convince Kendrick Slaughter, who is black, to lie about his residency so that he could run against a white incumbent rather than running against and splitting the vote with a black candidate.  See infra p. 26-27.

Thompson had rented an apartment (which he did with Brown's assistance), the apartment had no utilities, appliances or furniture, and the phone number on Thompson's qualifying forms was a Madison County number. Walker first tried unsuccessfully to have Thompson declared disqualified by Brown and the NDEC, and was eventually forced to file suit in chancery court where he was successful in getting Thompson disqualified. <u>See</u> <u>Walker v.</u> <u>Noxubee County Democratic Executive Committee</u>, Civil Action NO. 2003-028 (Nox. Cty. Cir. Ct. May 13, 2003) (finding Thompson had not shown an actual residence in Noxubee County with a bona fide intention to remain and that not being a resident of Noxubee County, was not qualified for the Office of County Attorney).

The court also finds that in 2005, Brown tried to convince Kendrick Slaughter, a black resident of Ward 4 for the City of Macon, to use his sister's address and run against the white incumbent, James Watkins, in Ward 2, telling Slaughter that if he ran in Ward 4, where Slaughter in fact lived, he and another black candidate, Willie "Man" Dixon, would "split the black votes between [them] and let the white one (Barbara Hutchinson) win."[16] Despite Brown's appeal to him, Slaughter refused because he was

---

[16]    Slaughter testified, "He just told me to change my address because more than likely. . . me and the other black guy running, he's going to put the white lady into office."

not, in fact, a resident of Ward 2 but a resident of Ward 4;[17] Slaughter lost his bid for the position.

Both of these instances occurred at a time when Brown was chairman of the NDEC, and in both instances, Brown not only recruited black candidates to run against whites with the aim of defeating white incumbents, but his plan involved the candidates' falsely representing their residency in order to qualify to run. Although Brown was ultimately unsuccessful in his efforts to get Thompson on the ballot and to get Slaughter on the ballot for the ward in which Brown wanted him to run, the fact that he made these attempts speaks volumes on the issue of his racial intent and his willingness to violate the law to achieve his goal of all-black leadership for Noxubee County.[18]

---

[17]     Section 21-3-9 of the Mississippi Code provides that "[t]he mayor and members of the board of aldermen shall be qualified electors of the municipality and, in addition, the aldermen elected from and by wards shall be residents of their respective wards."

[18]     The Government claims that in addition to attempting to qualify Thompson to run even though they knew he was not qualified, Brown and the NDEC allowed a black candidate, Bruce Brooks, to qualify to run for the Board of Supervisors in District 5 when they knew he probably actually resided in District 3. Brooks had run twice prior to 2003 in District 5 and been defeated by George Robinson, the black incumbent supervisor.  Then, in 2003, after he unsuccessfully tried to get the Board of Supervisors to redraw the district lines so that his home on Macon Lynn Creek would be located in District 5, Brooks qualified to run in District 3, claiming an address in that district.  Brooks ran against a white candidate, Johnny Kemp, and defeated Kemp in the runoff by a margin of 42 votes.  The Government argues that Brown and the NDEC had good reason to question whether Brooks was a permanent resident of District 3 and yet chose to make no inquiry

27

Walker's Petition:

Brown's blatantly obstructionist conduct with respect to Walker's petition challenging Thompson's candidacy is consistent with complicity on Brown's part in recruiting Thompson and is evidence of his racial intent.  Brown purported to schedule a hearing on Walker's petition, to be held at Brown's personal residence, of all places, but he gave Walker short notice of the meeting and specifically refused Walker's request for a current list of NDEC members and a copy of the State Party Constitution. Brown did not give notice of the hearing to all members of the NDEC, and when Walker appeared for the hearing, Brown refused to allow him to present his petition and accompanying evidence to the members present, claiming the petition was inadequate because it did not set forth the specific basis for Walker's challenge, even though Brown was well aware of the basis and Walker was armed with evidence substantiating his position.[19]  Without taking a vote or

---

into his residency because they wanted a black candidate to defeat Kemp.  Although Brooks did own a home in District 3 and maintained that he was living in the home at the time of the election, the circumstances were certainly suspicious.  Brown and the NDEC were likely aware that a question existed as to Brooks' qualification to run in District 3, but in the absence of a challenge by Kemp or some other candidate to Brooks' qualifications, they were arguably entitled to accept Brooks' representations.

[19]   Mississippi Code Annotated § 23-15-961 states, "Any person desiring to contest the qualifications of another person as a candidate for nomination in a political party primary election shall file a petition specifically setting forth the grounds of the challenge within ten days after the qualifying deadline for the office in question."

consulting any members of the NDEC, Brown refused to allow Walker
to proceed.  Moreover, Brown banned two white NDEC members from
even attending the meeting/hearing.  When Wallace Gray and Robert
Cunningham arrived, Brown met them in the garage, told them they
had been put off the committee and were no longer members and that
he might have to get the law.  Brown allowed them into his house,
but told them they would have to stay in the kitchen.  In fact, in
keeping with the party's constitution, Gray and Cunningham could
only have been removed from the NDEC after proper written notice
and an opportunity for a hearing, which never occurred.[20]  That
Brown was willing to ignore those rules altogether and exclude
Gray and Cunningham from the meeting with no proper cause[21] and yet

---

[20]    The State Constitution or the Democratic Party provides
that "[t]he seat of any member of any party unit executive
committee shall be declared vacant by a two-thirds vote of those
members present and voting at any regularly scheduled or called
meeting of the executive committee upon the happening of one of
the following: (a) it is brought to the attention of the executive
committee in writing that a committee member has missed three or
more consecutive regular meetings of the committee;. . . .,"
provided that before the seat of any executive committee member is
declared vacant, all members of the executive committee and the
accused member whose seat is proposed to be vacated shall be given
30 days' written notice specifying the cause or causes in
reasonable detail as to time, date, place, accusers and witnesses
thereof.  Democratic Const.  Art. IV, §§ 6.  The member is
entitled to request a hearing, and if one is requested, it must be
provided and followed by a written decision by the committee.  Id.

[21]    The court is aware that Brown also barred a black NDEC
member, Ms. Gibson, from participating in the Walker hearing at
his house and went so far as to threaten to call the police if she
would not go into the kitchen with Gray and Cunningham.  No
evidence was presented as to any ostensible basis for excluding

was totally inflexible in denying Walker's reasonable request to present his petition to the NDEC supports the court's finding that Brown's handling of the entire Walker/Thompson situation was motivated by discriminatory intent.

Racial Appeals:

Similar to his racial appeal to black voters to vote Eddie Coleman out of office in 1999,[22] in May 2003, Brown made a direct charge of race discrimination against Coleman which he knew was unfounded and did so to motivate black voters.  In a letter published in the *Macon Beacon* in May 2003 from Brown, as "Democratic Chairman" and "Chairman East Mississippi Voters League" to the "Concerned Citizens of Noxubee County," Brown wrote:

> This is an open letter to all Democratic voters.  In 2003, 138 years after the end of slavery and 38 years after the passage of the Voting Rights Act, we still have the vestiges of discrimination and slavery in Noxubee County.  There is discrimination in the location of paved roads and slavery to the Board of Supervisors in Noxubee County.
>
> *Discrimination* is evident because roads that are paved are primarily where the whites live, blacks live on gravel roads.  In District 4 Mashulaville Supervisor Eddie Coleman paved a road to the last white resident's house and stopped.  He then paved a road in an all-white area where his cousin and Foreman, Gerald Butler, lived.

Ms. Gibson but whatever the reason may have been, the fact that Ms. Gibson was excluded does not detract from the court's opinion that Gray and Cunningham were excluded for racial reasons.

[22]    See supra p. 21-22.

> This is not fair and must end.  *Slavery* is evident
> because the Supervisors do not want you to have paved
> roads; they want you to have to beg them for gravel and
> to fix your road.  This is not fair and must end.

Brown had previously written a letter to the newspaper criticizing each of the four incumbent members of the Board of Supervisors who were running for reelection, including three black board members. However, in the May 8 letter, he singled out Eddie Coleman, making what he knew were unfounded charges of race discrimination by Coleman.  Brown admitted at trial that he believed that Coleman had done the best job of all the supervisors with respect to the paving of roads.  He also clearly knew the allegation that Coleman had paved roads only where white residents lived, or that he had paved one particular road only to the point where the last white person lived and stopped, falsely portrayed Coleman's actions. Yet Brown again used race "to get the job done."

<u>Absentee Ballot Program</u>:

The most serious charge by the Government in this case relates to Brown and the NDEC's alleged involvement in racially motivated abuses of the absentee ballot process in Noxubee County. To fully appreciate the Government's position, it is first necessary to understand the basic rules governing absentee voting in Mississippi.

Under Mississippi law, a voter may not simply choose to vote absentee; rather, the election statutes provide that only certain registered voters are eligible to vote by absentee ballot.  <u>See</u>

Miss. Code Ann. § 23-15-713.[23]   Under the applicable statutes, a
voter can obtain an absentee ballot in only two ways:  appearing
in person at the county registrar's office (here, the circuit
clerk's office) and voting early, or requesting a ballot by mail
and mailing it back.  See Miss. Code Ann. § 23-15-715.  However,
only certain voters may qualify to vote by mail, namely persons 65
and over, disabled, temporarily residing outside the county or who
have a spouse, parent or child hospitalized more than fifty miles
away and who will be with the spouse, parent or child on election
day.  Miss. Code Ann. § 23-15-721.  Whether voting in person or by
mail, the voter must first request an application for an absentee
ballot; this request may be made orally or in writing by the voter
or a third party acting on his behalf.  Miss. Code Ann. § 23-15-
715.

     Once the voter has completed the application for an absentee
ballot, which must be signed and sworn by the elector, the voter
is to be provided a ballot and an envelope to be sealed and be

---

     [23]   These include:  students or teachers (and their spouses
and dependents) whose studies or employment require them to be
away from the county of their voting residence on election day;
persons who are away from their county of residence on election
day for any reason; persons who will be required to be at work on
election day during the times at which the polls will be open;
persons who are 65 or older; persons with a temporary or permanent
physical disability; members of the Mississippi congressional
delegation (and their spouses and dependents) who will be absent
from Mississippi on election day; and persons who have a spouse,
parent or child hospitalized more than fifty miles away and who
will be with the spouse, parent or child on election day.  Miss.
Code Ann. § 23-15-713.

imprinted with a voter's affidavit and a certificate of an attesting witness. Miss. Code Ann. § 23-15-719. If the voter requests to vote by mail, the circuit clerk's office will mail the application and the absentee ballot and ballot envelope to the address provided by the voter. Miss. Code. Ann. § 23-15-715. By law, the voter must appear before an official authorized to administer oaths and mark the ballot in secret but in the presence of such an official. Miss. Code Ann. § 23-15-719. The voter is to then seal the ballot in the envelope, sign his name across the flap of the envelope, sign the affidavit, have his affidavit notarized, and have the attesting witness sign. Id. For those voting by mail, the envelope containing the ballot must be mailed to the registrar so that it is received prior to 5:00 p.m. of the day preceding the day of the election. Miss. Code Ann. § 23-15-731. The provisions requiring that a voter request an absentee ballot, that he actually vote his own ballot, and that he place and seal the ballot in the provided envelope "are intended to ensure the integrity of absentee ballots." Lewis v. Griffith, 664 So. 2d 177, 185 (Miss. 1995).

Turning to the Government's allegations, with respect to the August 2003 primary and runoff in particular, the Government has proposed that Brown and the NDEC engaged in a pattern of absentee ballot abuses that was designed, from start to finish, to minimize white voter participation. According to the Government's theory,

33

the first phase of this absentee ballot scheme involved Brown's hiring notaries and sending them into the black community to collect ballots from voters who were encouraged to vote for his candidate of choice or for whom his notary actually completed the ballot (sometimes with, but sometimes without the knowledge and consent of the voter).  Then, to ensure these ballots would be counted, Brown and the NDEC put in place a nearly all black force of poll workers and managers, over whom they had effective influence and control, and who, under Brown's direction, ignored or rejected proper challenges to the ballots of black voters. While the Government's theory in this regard, that Brown and his "associates" and "allies" orchestrated such a scheme, may seem improbable, having thoroughly reviewed and considered the evidence, the court has come to the firm and definite conclusion that there is substance to the Government's position.

What is most striking about absentee voting in Noxubee County is the sheer volume of absentee ballots cast in relation to the number of qualified electors.  The Government's expert testified without contradiction that in other jurisdictions, including other jurisdictions in Mississippi, the normal rate of voting by absentee ballot in a given election ranges from around three to six percent.  In Noxubee County, however, the rate is around twenty to twenty-three percent.  This rate is astounding given that Mississippi is not an "early voting" state and that voters

must meet one of the eligibility requirements to vote absentee. It is highly unlikely that twenty percent or more of those on the voter rolls of Noxubee County are eligible to vote by absentee ballot.  The Government's expert maintains, and the court would agree, that even taking into account that there could have been an exceptionally efficient "get out the vote" campaign at work here, this level of absentee voting "cannot happen except when you're generating absentee ballots on a fraudulent basis," for there is no "reasonable legal rationale that would account for this degree of difference."[24]  The question becomes whether this situation is traceable to defendants.  The Government insists it is.

As all absentee voters, with the exception of those who are temporarily disabled, are required to have their absentee ballot application and certificate notarized, to conduct an effective, widespread absentee ballot operation, access to notaries is critically important;[25] and the simplest way to ensure voters have easy access is to have a notary going to people's homes to

_____

[24]    There is no proof that Noxubee County has an unusually higher number of persons that would qualify to vote absentee than any other jurisdiction.

[25]    See Roe v. State of Ala. By and Through Evans, 43 F.3d 574, 582 n.15 (11th Cir. 1995) (taking judicial notice of fact that reducing inconvenience of voting absentee would increase the number of absentee ballots).

notarize and collect their ballots for mailing.[26]  This was
undeniably done on a large scale in Noxubee County.  Nearly every
local candidate running for office had one or more notaries doing
absentee ballot work for them, traveling around and collecting
ballots from persons they considered supporters.  As the court
understands the process, if the candidate found that a supporter
wanted to vote absentee, the candidate would help the voter by
letting him know how to get an application to vote absentee;[27] and
once the candidate determined from records in the circuit clerk's
office that an application and ballot had been mailed to that
voter, he would give the voter's name and address to a notary
(this would usually involve a list of names), who would then go to
the voter's house to notarize and collect the ballot for mailing
once the voter had voted.  Some notaries did this work as a public
service or because they supported and wanted to help a particular

_____

[26]    Those who vote by absentee ballot at the courthouse are
required to have their applications and ballots notarized by the
circuit clerk.

[27]    The Government claims that Circuit Clerk Mickens and his
staff misinformed one white candidate, Samuel Heard, Jr., as to
the allowable methods for requesting an absentee ballot by telling
him that the request had to be made in writing, and then requiring
Heard to make his own "homemade" request form but failing to tell
him that the forms had to include the voter's signature.  Only
after Heard learned that voters who had completed his homemade
forms were not receiving their requested absentee ballots in the
mail was he told that the request could be made by phone.  While
Heard believed he was intentionally misled, it is possible this
was nothing more than a misunderstanding (and of course, Mickens
is no longer an active defendant and there is no evidence showing
that any other defendant was aware of Heard's difficulties).

candidate.  However, it seems that most were hired and paid in one form or another for their services.  The witnesses who addressed this subject, including Dr. Arrington, agreed there was nothing impermissible about paying notaries for their services, so long as they were not paid based on the number of ballots collected, as it is illegal under Mississippi law to pay a notary per absentee ballot collected.[28]  See Welch v. McKenzie, 592 F. Supp. 1549, 1553 (S.D. Miss. 1984) ("It is not . . . improper for a candidate to urge his supporters to utilize the absentee voting procedures where they are applicable, nor is it improper for a candidate to instruct his supporters as to how they may obtain and vote such ballots.").

Although not a candidate, Ike Brown was plainly heavily involved in an absentee ballot program.  The uncontroverted evidence showed that from 1999 to 2004, but principally in late 2002 and 2003, a corporation owned by Brown, RMB Enterprises, paid the notary application fees of more than fifty persons, nearly all of them residents of Noxubee County.  For at least some of these

---

[28]   See Miss. Code. Ann. § 23-15-753(2) ("It shall be unlawful for any person who pays or compensates another person for assisting voters in marking their absentee ballots to base the pay or compensation on the number of absentee voters assisted or the number of absentee ballots cast by persons who have received the assistance. Any person who violates this section, upon conviction shall, be fined not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or imprisoned in the Penitentiary not less than one (1) year nor more than five (5) years, or both.").

applicants (three of which Brown actually admitted but likely more), Brown's corporation also paid for their surety bonds, which they required in order to do notary work.  Brown's acknowledged purpose in paying these fees was so these notaries could become involved in the absentee ballot process.  That, in itself, would not be improper, for facilitation of lawful and proper absentee voting would be a legitimate facet of any effort to turn out votes,[29] which Brown claims is all he was doing.  But the Government claims Brown's efforts were anything but legitimate.

Brown testified that his work in establishing notaries in Noxubee County was part of an effort by him to turn out as many Democratic votes as possible in the 2002 congressional race between Chip Pickering and Ronnie Shows, and he insists that he was highly successful in this regard, as Noxubee County had one of the highest turnouts on election day 2002.  The evidence does support his position in this regard.  For example, in 2002, prior to the Pickering/Shows race, Brown requested that the state Democratic party pay substantial sums to fund the application and certification fees for notaries;[30] and the fact that most of the

---

[29]   Although Rickey Cole, Chairman of the State Democratic Executive Committee, was critical of Brown's position on and approach to many issues, he did agree that an absentee ballot program is a legitimate part of an effort to turn out votes.

[30]   Cole believed that as a result of his denying Brown's request for this funding, Brown no longer considered Cole an ally.

38

notary applications for which RMB paid were made in 2002 is consistent with Brown's testimony concerning his "get out the vote" efforts in the 2002 race.  However, there is also credible direct evidence, as well as circumstantial evidence, which links Brown to improper absentee ballot activity during the 2003 election in Noxubee County.

Gwendolyn Spann, called as a witness by the Government, testified that Brown approached her in 2003 about doing notary work; at Brown's direction, she got an application from Circuit Clerk Carl Mickens' office, which she completed and gave to deputy clerk Freda Phillips to mail.  After Spann received her kit in the mail, Brown hired her to do absentee ballot work in the 2003 Democratic primary.  Spann explained that she was told to get a list from Phillips of the voters she needed to contact and she did so; all of the voters on the list were black so all of the voters from whom she collected ballots were black.  Spann periodically reported the number of ballots she had collected to Brown, who paid her in cash, not "per ballot," she maintained, but based on "the amount of work"; in other words, she said, the more ballots she collected, the more she was paid.[31]  In the end, she said,

---

[31]     The practice of paying more for more ballots would seem to come perilously close to the prohibition against paying "per ballot."  See supra note 28.  The distinction seems more one of phrasing that of substance.

Brown was satisfied with her work, but felt she could have collected more ballots.

Although Spann testified that she never assisted anyone in marking a ballot unless they asked for help (which she claims happened only about three times), and stated that Brown never gave her instructions to do anything she thought was wrong, the fact remains, he paid her (by volume) to collect absentee ballots from black voters and black voters only.[32]

Testimony from Mable Jamison provided further evidence of Brown's involvement in an absent ballot program. Jamison, a notary public who lives in Noxubee County, did some notary work during the 2003 primary, not for any particular candidate but as a public service, to help people who needed a notary. Jamison testified that Brown called her on the phone and was upset that she was picking up his ballots. Brown, she reported, did not appreciate what she was doing: "He pretty much said that his people had did the initial leg work and I shouldn't be picking up his ballots." Brown clearly indicated there were specific people collecting absentee ballots under his direction, and he wanted control over who was collecting those ballots.

The Government also presented direct evidence of fraud in the collection of absentee ballots by one notary in particular, Carrie

---

[32]   Interestingly, Spann was assigned as a poll manager for the Prairie Point precinct, where she did her notary work.  She testified that none of her ballots were challenged.

Kate Windham, who became a member of the NDEC during Brown's chairmanship and whose notary application fee and surety bond were paid by Ike Brown.  Susan Wood, who is black, testified that after she voted absentee at the courthouse one time in 1999, she inexplicably began receiving absentee ballots by mail notwithstanding that she is neither illiterate nor disabled nor incapable of going to the poll to vote.  Windham started coming over to Wood's house to assist her in voting, and Wood now votes absentee in every election and each time is assisted in voting by Windham.  According to Wood, Windham actually marks Wood's ballot for her and selects candidates when Wood does not know whom she wants to vote for because, as Wood put it, Windham "knows folks" better than Wood does.[33]   Wood testified that her daughter lives with her, and although her daughter is not disabled or illiterate and was not going to be out of the county on election day, she was recruited to vote absentee by Windham.  The same was true of Otis Shanklin, who also lives in Wood's home.  Shanklin is not disabled, can read, and is able to go to the poll on election day, yet he casts his vote by absentee ballot in every election and is assisted in every election by Windham; and if he does not know whom to vote for, he has Windham vote for him.

---

[33]    The election statutes require that the voter mark her own ballot in secret, then deposit her own ballot in the envelope provided, seal the envelope and sign the flap.  See Miss. Code Ann. § 23-15-721.  Mississippi election laws make it illegal to assist voters in this manner.  See Miss. Code Ann. § 23-15-555.

Another black voter, Nikki Nicole Halbert, testified at trial that Windham came to her home and recruited her and her mother to vote absentee, telling them all they had to do in order to vote absentee was to let Windham know.  Although Halbert never requested an absent ballot application, a ballot came in the mail. Not long after, Windham came by Halbert's house to pick up the ballots.  Halbert had already voted her ballot.  Halbert handed Windham the envelope and ballot and Windham left without signing or sealing it.  When shown the application form and envelope at trial, Halbert maintained that the signatures on the application and ballot envelope were not hers, and that whoever had filled out the application had checked the box indicating Halbert was voting absentee because she had a temporary or permanent disability, which was untrue.  To refute Halbert's testimony, the defense offered testimony from Catherine Johnson, who claimed to have accompanied Windham to Halbert's home and to have observed Halbert sign the application and ballot envelopes; the court fully credits Halbert's testimony in this regard.[34]

_____

[34]    After testifying on January 22, Halbert was again called to the stand by the Government on January 29, regarding a visit to her home by Windham and Johnson after she had testified.  Halbert testified that as she left the courthouse, she overheard Brown tell Dorothy Clanton, Windham's sister and also a member of the NDEC, to "Call Carrie Kate."  Twenty minutes after Halbert arrived at home, Windham and Johnson came to her home.  According to Halbert, whose testimony the court credits on this subject as well, Windham confronted her about her testimony, told her, "We black people need to stick together," and suggested that she needed "to tell them that you probably didn't understand what you

It is hardly likely that these incidents represent the extent
of Windham's fraudulent absent ballot activities in the 2003
election conducted under Brown's leadership; on the contrary, the
court considers it quite likely these are merely examples of
Windman's activities.[35]  Moreover, while the only direct evidence
linking Brown to Windham's notary activities is the fact that he
paid for her notary application fee and bond, based on the
totality of the evidence, the court has little doubt that Windham
was one of Brown's "people."  Furthermore, while Brown may not
have specifically directed Windham's activities, the court is
convinced the two were working together and that he encouraged her

---

was being asked, the reason you said what you said."  When Halbert
refused, Windham suggested to Halbert that what had probably
happened was that she and Halbert had "got to talking and I let
your mother sign your name."  Halbert and her mother responded
that this was not what had occurred.  Windham and Johnson left,
but returned twenty minutes later and had Halbert sign her name on
a piece of paper.  Despite this effort on the part of Windham and
Johnson to persuade Halbert to change her testimony, Halbert
stated she was still convinced that it is not her signature on the
application and ballot envelope.

[35]   In a 1993 election contest brought by Mary Allsup, a
white candidate, alleging absentee voter fraud, there was
testimony at the trial by Earline Moore that Windham marked her
absentee ballot and sealed the envelope so quickly that Moore
could not see whose names she had marked.  When Moore protested,
Windham told her it was too late, the envelope had already been
sealed.  Moore reluctantly signed the envelope.  Although Moore
did not tell Windham she wanted to vote for either candidate in
the contest between Allsup and her black opponent, when Moore's
ballot was opened at trial, the ballot had been marked for the
black candidate.  Based on this and other evidence, a jury found
that Allsup was entitled to a new election.

actions, or at the very least was aware of and condoned Windham's tactics, which furthered his agenda.

The evidence at trial showed that Brown closely monitored the activity surrounding the circuit clerk's receipt of absentee ballot requests and the mailing and return of voted absentee ballots during the August 2003 Democratic primary.   The circuit clerk's office is required by law to maintain a record of all absentee ballot activity, which includes a list of every person who has made request for an absentee ballot, the date on which the application and ballot were mailed to the voter and the date on which the application and ballot were returned.   Brown checked the absentee ballot record book in the clerk's office at least once and usually twice or more each day to see who had requested absentee ballots, what precinct the ballots were mailed to, whether the ballots were mailed, and whether the ballots had yet been returned by the voters.[36]   Notably, too, there was evidence

---

[36]     As additional evidence that white candidates were not afforded equal access to the absentee ballot process, the Government claims that while black candidates were allowed behind the public counter in the circuit clerk's office, Brown once ordered Eddie Coleman to leave when Coleman was behind the counter viewing the absentee ballot book.  However, at the time, voters were present voting their absentee ballots and it is undisputed that Brown had previously proposed to Circuit Clerk Mickens a rule that no candidate be behind the public counter when a voter was voting.  Brown apparently believed they had agreed on the rule, but Mickens did not, and he allowed Coleman to remain.  Although the incident could have been avoided, the court is not persuaded that it amounted to much more than a misunderstanding between Brown and Mickens.

that for the runoff election between Johnny Kemp and Bruce Brooks, Brown copied the pages of the absentee ballot book and tallied the number of white and black ballots returned for each precinct. His interest, in the court's opinion, was more than casual.

An absentee ballot can only be effective if it is counted; and according to the Government, toward ensuring that the ballots collected by "his people" would be counted, Brown and the NDEC, working together, put in place a force of poll workers and managers that was more than 90% black and that was comprised largely of persons over whom they had influence, and then took steps to push them through the counting process by preventing, ignoring or rejecting challenges. There is ample credible proof of the extent of Brown and the NDEC's control over the process of counting ballots and that the process was conducted in many instances in blatant disregard of applicable law.

The Government does not claim that Brown or the NDEC rejected any white person's request to be a poll worker for the Democratic primary. Rather, it claims that, notwithstanding that there was no shortage of white persons available and willing to work the polls, Brown made no effort to include any whites as poll workers. Rickey Cole, Chairman of the State Democratic Executive Committee, testified the Democratic party has a rule of thumb, honored by most local chairs, that encourages the hiring of poll workers in each precinct to be representative racially of the Democratic

45

electorate in that precinct.  According to Cole, the general consensus among most chairs was that it was desirable that there be a racial composition reflective of the Democratic electorate.[37] He recalled that Brown, in contrast, was very adamant in saying, "In Noxubee County we hire who we want to."  And that is precisely what he and the NDEC did.  For the August 5, 2003 primary, 103 of 110 workers were black, so that the workforce on the Democratic side was only 6.3% white; and in most of the thirteen precincts, all of the poll managers, whose job it was to review and count absentee ballots, were black.  For the August 26 runoff, 74 of 78 poll workers were black, or only 2.6% white.

At trial, Brown insisted that he had no control over the selection of poll workers and that this was solely the prerogative of the NDEC; his only input was as to his own district, District 2.  Although it may be true that the chairman is not ultimately responsible for choosing poll workers and that this is a function of the NDEC, the court is convinced that Brown had vastly more influence over these decisions than he would have the court believe.  In any event, the NDEC is also a defendant.  Brown also claimed that he told the NDEC that the number of white poll workers needed to be increased; his testimony on this point is not

---

[37]     John Bankhead, who preceded Brown as chairman of the NDEC, testified that he adhered to this view and this policy, and that the workforce for the Democratic primary in 1999 when he was chairman was 21.2% white.

credible.  Brown finally attempted to justify the dearth of white Democratic poll workers by reference to the all-white force of Republican poll workers; yet in Noxubee County, the Republican party, unlike the Democratic party, is all white, and contrary to what Brown may believe, the Democratic party is not all black.

Courts have found that a low number of minority poll workers can impair minority access to the electoral process by making the polls feel less open to minority voters and can undermine the confidence minorities have in the openness of the system.  See Harris v. Graddick, 593 F. Supp. 128, 130-31 (M.D. Ala. 1984).[38]

---

[38]  In Harris v. Graddick, involving alleged impairment of the rights of black voters, the court recalled the long history of official discrimination against Alabama's black citizens, and acknowledged the negative impact that history has had on black voting:

> They understandably still harbor strong fears of entering all-white public places, even though they are now legally entitled to do so.  They find the simple act of registering and voting, especially when the voting officials are all white, an extremely intimidating experience; and as a result, many of them do not register, and many of those who do register do not vote. For these persons, the political process is still not open, is still not available to the same extent it is and has been available to white persons.

> The evidence before the court further reflects that the presence of black poll officials, those responsible for conducting the operations at a polling place, goes a long way toward allaying these fears and opening up the political process to those suffering from such fears. The open and substantial presence of black poll officials, according to the evidence, is a significant indication to many black persons that voting places are now open to all, that black persons not only have a legal right to come and vote, they are welcome.  And, of course, the more black poll officials there are, the

White voters in Noxubee County, not being encumbered by the
memories and lingering effects a long history of official
discrimination, are not likely to feel intimidated by the voting
process; but white voters, like black voters, are no less likely
to be skeptical of a process which they do not perceive as open.
This, however, is not the court's greatest concern here.  Rather,
the court finds that Brown and members of the NDEC intentionally
selected a nearly all-black work force primarily as a means of
facilitating a scheme to disenfranchise and dilute white voting
strength by pushing through absentee ballots that had been
collected by Brown's people.

　　　Mississippi law prescribes in detail the procedure for
handling and counting absentee ballots, which is the
responsibility of the poll managers.  When the polls have closed,
the poll managers "shall then publicly open the box and
immediately proceed to count the ballots," Miss. Code. Ann.

---

　　　　　greater the confidence black persons will have in the
　　　　election process, and the less fear they will have about
　　　　participating in that process.
　　　　　　The open and substantial presence of black poll
　　　　officials, according to the evidence, is a significant
　　　　indication to many black persons that voting places are
　　　　now open to all, that black persons not only have a
　　　　legal right to come and vote, they are welcome.  And, of
　　　　course, the more black poll officials there are, the
　　　　greater the confidence black persons will have in the
　　　　election process, and the less fear they will have about
　　　　participating in that process.
593 F. Supp. 128, 130-31 (M.D. Ala. 1984).  Of course, Mississippi
has the same history.

48

§ 23-15-581, including absentee ballots.  By law,

> Each candidate shall have the right, either in person or
> by a representative to be named by him, to be present at
> the polling place, and the managers shall provide him
> and his representative with a suitable position from
> which he or his representative may be able to carefully
> inspect the manner in which the election is held.  He or
> his representative shall be allowed to challenge the
> qualifications of any person offering to vote, and his
> challenge shall be considered and acted upon by the
> managers.

Miss. Code Ann. § 23-15-577.  Further, "[c]andidates or their duly authorized representatives shall have the right to reasonably view and inspect the ballots as and when they are taken from the box and counted."  Id.

Before the absentee ballots are removed from the sealed envelopes, poll managers must "first take the envelopes containing the absentee ballots of such electors from the box, and the name, address and precinct inscribed on each envelope shall be announced by the election managers."  Miss. Code. Ann. § 23-15-639(1)(a).  The "signature on the application shall then be compared with the signature on the application and the signature on the back of the envelope."  Miss. Code Ann. § 23-15-639(1)(b).  If the signatures correspond, and the election managers find that the applicant is a registered and qualified voter, and that the voter has not appeared in person and voted at the election, then the poll managers are to open the envelope and remove the ballot from the envelope, without unfolding or examining it, and deposit it in the ballot box with the other ballots.  Conversely, if it is found

that the signatures on the application and ballot envelope "do not correspond," that the affidavit or certificate is insufficient, that the applicant is not a duly qualified elector, that the voter is not qualified to vote absentee, that the voter has voted in person, or that the ballot envelope is open or has been opened and resealed, the ballot "shall not be allowed."  Miss. Code Ann. § 23-15-641.  The poll managers must take the unopened envelope, mark across its face "REJECTED", with the reason for rejection.

When a vote is challenged at the polls, "whether the question be raised by a manager or by another authorized challenger," if it clearly appears in the unanimous opinion of the managers that the challenge is well taken, the vote is to be rejected entirely and marked "REJECTED."  Otherwise, it will be counted, but the challenged ballot must be marked "CHALLENGED", and counted only after all unchallenged ballots have been counted and tallied.

The Government has presented substantial, credible evidence in this case that during the 2003 Democratic primary election, these requirements were often disregarded.  During the August 5th primary, Peggy Brown, a poll watcher for Samuel Heard, Jr., the white candidate for sheriff running against the black incumbent Albert Walker, was present at the West Macon polling place.  Ms. Brown testified that when she started to challenge a ballot, poll manager Octavia Stowers called Ike Brown on her cell phone, and told him, "Ike, they're trying to challenge these ballots."  After

50

speaking with Mr. Brown, Stowers reported, "Ike instructed me to count all the ballots."  Stowers then said ballots could not be challenged, and she and the other managers continued opening ballots.  According to Ms. Brown, when she later tried to challenge another ballot because the signatures did not match, Stowers told her, "No. Ain't no ballots being challenged.  I was instructed by Ike not to – can't no ballots be challenged."

Samuel Heard, Jr. was present during the counting of absentee ballots at the East Macon precinct during the primary election, and testified that poll managers tore open the absentee ballot envelopes, and stacked the envelopes on one end of the table and the ballots face down on the other end.  They did not call out the names of the voters, check the register to see if the person had voted at the polls or take the time to check the envelope and application to ensure the statutory requirements were met. Moreover, all this was being done at such a pace and in such a fashion that poll watchers "didn't even have time to think about looking at the envelope versus the application to check signatures."  When Heard tried to get them to stop this process, a deputy sheriff who was present, John Clanton, told the manager, Annie Pearl Rice and Clanton's niece, Patricia Clanton, "Don't listen to him.  He can't tell you how to do your job.  You know what you're supposed to do.  You know what you've been told to do.

You open those envelopes now and get those ballots down to the end."[39]

At some point, controversy arose when it was noticed that the absentee ballot of a person who had voted at the polling place had been separated from its envelope and mixed in with all the other absentee ballots.  Heard testified that Ike Brown, who had been in the sheriff's office across the hall, came charging over, waving his arms and telling the workers, "Count every vote, count them every one right now.  Pick up those absentee ballots that are on that table and bring them over here and put them in that machine right now."  When it was all over, Heard turned to Annie Pearl Rice and asked why they had done it this way; she responded that Mr. Brown had told her to.  Kevin Jones, the (black) incumbent superintendent of education who was running for reelection, testified that he came in the middle of the controversy, and though he testified he did not know the totality of the situation,

---

[39]   It appears that Patricia Clanton was a poll worker.  As for John Clanton, the Government has contended throughout the case that the sheriff's department in Noxubee County operates as the "strong arm" of Ike Brown and the NDEC.  It points, for example, to Clanton's actions on this occasion, which were consistent with Brown's directions to poll managers at other polling places, as well as to the facts that Brown was chauffeured around to polling places on election day by the sheriff's department; that he regularly threatened to call "the law" on people and to have them arrested; and that the actions of Deputy Sheriff Terry Grasseree, also a member of the NDEC, suggested a close association with Brown.  The court would simply observe that there is considerable evidence that Brown has close ties to the sheriff's department and that he often implies that he has the support of the sheriff's department.

he confirmed that Brown did come in and tell the poll managers, "Count them."

Len Coleman, a poll watcher for his cousin Eddie Coleman at Table 1 in the Shuqualak precinct during the counting of absentee ballots, described the process as speedy and disorganized, which made it difficult for him to see if the absentee ballots had been voted in compliance with Mississippi law.  Len Coleman said there were ballots he wanted to challenge, but that this was difficult to do, given how quickly poll workers were moving.  He complained, but they continued in the same manner at the direction of Gary Naylor, who was not a manager but a member of the NDEC.  Poll watchers were able to make some challenges to obvious deficiencies, and some of their challenges were sustained.  However, at some point during the process, Brown arrived, and told poll workers, "No, we are not going to do that.  We're going to count them all."  Poll managers began counting all the absentee ballots, including those that had already been successfully challenged and rejected, despite the fact that they should not have been counted.  When Len Coleman objected that poll managers were counting even the ballots that had already been rejected, Brown ignored him.

Eddie Coleman was also at the Shuqualak precinct and testified that as poll workers were going through the ballots and checking them, they were "going a little too fast" and were not

giving poll watchers very much time to challenge them.  Some had been laid out that they were not going to count, but then Ike Brown arrived.  As related by Eddie Coleman, when Brown saw the ballots sitting out on the table, he said, "No, we are not going to do that.  We're going to count them all," and told the workers to take them and put them in the machine.

As reported by Richard Heard, poll watcher for his father Samuel Heard, Jr., the poll managers at the Title 1 precinct (two black and one white) moved through the absentee ballot process very quickly, and were obviously not checking the applications and envelopes for deficiencies; and because of how fast they were going, he was also unable to view the ballots and check them for irregularities.  Although Heard asked the managers to slow down so he could check the ballots, they ignored him.  He did notice one ballot and application (which had been notarized by Carrie Kate Windham) on which the signatures obviously did not match; but when he tried to challenge the ballot, the "head" manager, Dorothy Clanton McCoy, secretary of the NDEC, joined by her sister and fellow NDEC member Carrie Kate Windham, argued that the signatures did match and his challenge was rejected.[40]

Samuel Heard's daughter, Libby Abrams, a poll watcher for her father, testified that the process at the Brooksville polling

_____

[40]   Carrie Kate Windham was not a poll manager and it is not clear what her role was in the process.

place was similar: the poll managers did not compare the
signatures on the applications and envelopes; at the table where
Abrams was located, the ballots were being processed so quickly it
was nearly impossible for her to observe the applications and
ballots so she could decide whether to make a challenge.  There
were a few ballots as to which she tried to make challenges, but
was told by poll manager David Harrison, who is black, "We are
taking them anyway."  No vote was taken by the poll mangers on her
challenges.

There was also undisputed evidence that Brown went through
the absentee ballots for Brooksville the night before the August
26 runoff and put post-it notes on a number of the ballots
identifying reasons for rejecting the ballots.  Johnny Kemp, a
white candidate for supervisor running against Bruce Brooks in
District 3, testified that Brown came in as they were getting
ready to go through the absentee ballots and told the poll
managers, "I've already went through these absentee ballots and I
put y'all's stick-on stickers on the ballots that I want rejected
and the rest of them is all right to count."  He told them the
reasons for rejection were on the yellow stickers.  According to
Kemp, the managers did as Brown said, and rejected all those
ballots and "pretty well counted all the rest of them."  Unlike at
some of the other polling places, the managers did take the time
to call out the names of the voters (though not their address or

precinct) and checked the poll books to see if the voter voted at the polls.  Kemp stated that if they determined that the voter had not voted in person, the managers tore open the ballot and counted it, without checking anything, and without affording candidates or poll watchers the opportunity to observe the ballots so as to be able to challenge them.  Kemp complained to poll manager David Harrison that they needed to slow down so that everyone could look at the ballots and envelopes and compare them and have a valid opportunity to challenge them; Harrison responded, "We can't look at every ballot and every application.  We'll be here all night.  We are going to count them."

The Government submits that by processing and/or directing the processing of the absentee ballots in a fashion directly contrary to Mississippi law, Brown and NDEC members denied white candidates and their poll watchers an opportunity to challenge absentee ballots and have those challenges voted upon in the manner prescribed by the Mississippi Election Code.  It submits these actions were taken because Brown and the NDEC were aware of the following: (1) large numbers of absentee ballots had been voted at Brown's encouragement; (2) many of these absentee ballots had been notarized by Brown-funded notaries; (3) some of those ballots contained material defects that were challengeable; (4) many of those absentee ballots were marked for black candidates favored by Brown; and (5) Brown's desire to defeat all of the

white candidates for local office would be furthered by the poll managers complying with Brown and the NDEC's orders to count all of these absentee ballots.[41]

For their part, Brown and the NDEC deny that the process followed by poll managers in counting absentee ballots during the 2003 primary was improper in any respect or that Brown or any NDEC member gave any instructions to poll managers as to how or whether to count any ballots; and they point out that black and white candidates and their poll watchers were give the same opportunity to view and make challenges. Finally, defendants submit that the

---

[41] The court notes that a number of the Government's witnesses also claimed that blacks and whites were not treated the same during the ballot counting. Samuel Heard, Jr., claimed, for example, that whereas Deputy Sheriff John Clanton had stood over him and pointed a finger at him, he had not acted this way toward anyone else; yet Heard was the only one who complained. Had others spoken up, they might have been treated rudely, as well.

Heard also complained that at the Brooksville precinct, Ethel May, who appeared to be in charge, along with Brown, refused to allow him to have more than one poll watcher, even though there were four tables. May finally relented, but only after the Secretary of State's office was contacted and confirmed a candidate's right to have multiple poll watchers if there is more than one table. Eddie Coleman also was told by a Shuqualak policeman to get out of the polling place when both he and Len Coleman were poll watching. Again, while no black candidates were refused more than one poll watcher, there is no evidence that any of them asked or attempted to have more have more than one poll watcher.

Len Coleman testified that when the ballots were being counted at Shuqualak, Table One, he was told to move away from the table whereas a black candidate was in a similar location and was not told to move. This may simply have been a matter of different perspectives; poll workers testified that unlike the black candidate, Coleman was leaning behind them and crowding them and was simply asked to step to the side.

Government's position on this issue is in any event grounded on the misconception that poll watchers have a right under the law to challenge the sufficiency of the application, or technical compliance with the requirements established by law for absentee ballots.

In response to the claims of Government witnesses, the defense offered testimony of a number of witnesses who were poll workers during the 2003 primary and/or runoff, including Robin Bankhead Mason (Title 1, Box 1); Virginia Dooley (Brooksville, Sub 2); Annie Earl Johnson (Brooksville); Octavia Stowers (West Macon); Sam Gilkey (West Macon); James Bridges (Brooksville); Doris Wilborn (High School, Box 1); Laura Diane Sparks (Shuqualak, Table 2); Velma Jenkins (Shuqualak, Table 2); and Chester Turner (High School, Box 2).[42]  Each of these witnesses testified consistently that whether challenged ballots are accepted or rejected is a decision that is made solely by the poll managers, who cannot be told by any member of the NDEC or the chairman how to treat or rule on any ballot; that neither Brown nor anyone else told poll managers what to do or how to rule on a challenge and that even had they done so, the poll managers would have followed their training; that poll managers did not go through the ballots too quickly or omit any step of the process, including calling out each voter's name, making sure the voter had not voted in person,

---

[42]   All of these witnesses are black.

and taking adequate time to check the ballot and application to make sure everything was correct; that poll watchers were given adequate opportunity to make challenges, and that there were either no challenges, or that challenges made were duly considered by the managers as required by law; that there were no complaints by poll watchers that they were not able to make challenges or no such complaints any witness could recall; and that all the candidates or their poll watchers, black and white alike, had the same adequate opportunity to challenge ballots.  The testimony of these witnesses was predictable, as it would have been surprising had those closely involved in the process admitted to having done other than what the law required of them.  The court finds it far more likely that the more accurate accounts of the way the process was conducted at the various polling places addressed were those provided by the Government's witnesses.[43]

---

[43]    The experiences recounted by these witnesses during the 2003 election mirrored in many respects Sue Sautermeister's experience during the 2002 general election.  Sautermeister was a member of the Hinds County Election Commission for 13 years, is a current member of the Ridgeland Election Commission and the Madison County Election Commission, serves on the Election Assistance Commission Board of Advisors and National Task Force for the Election Center on Training of Poll Workers, on the Civil Rights Advisory Commission for the State of Mississippi, and for 11 years has been an instructor for the Election Commissioners Association of Mississippi (ECAM) and the Secretary of State's office.  Sautermeister was a poll watcher for Chip Pickering during the November 2002 general election at the Title 1 polling place in Noxubee County.  Sautermeister testified that during the counting of absentee ballots, Brown came in and instructed poll workers to count the absentee ballots as long as there was a signature across the flap and to ignore everything else.

As for defendants' argument that the Government is mistaken as to the claimed right of candidates and their poll watchers to challenge the sufficiency of applications and ballots, the court would point out that regardless of whether such a right exists as a matter of law, the evidence in the case establishes without dispute that poll workers in Noxubee County were specifically trained by the NDEC that candidates and poll watchers had this very right.[44]  For example, Virginia Dooley and Sam Gilkey both

Notwithstanding that by law, the administration of general elections is the province of the Election Commission and that Brown has no authority under the law with respect to the conduct of general elections, as soon as he issued this directive, poll manager Dorothy Clanton McCoy (who is a member of the NDEC and also the sister of Carrie Kate Windham) stopped allowing challenges, saying she was not a handwriting expert and did not want to be there all night.  Prior to Brown's directive, Sautermeister had successfully challenged some ballots; afterwards, however, poll managers began to open the ballots rapidly, and did not call out the voters' names and addresses and did not check for anything other than a signature being across the flap.  Sautermeister's testimony, which the court found entirely credible, both lends credence to the accounts of Brown's misconduct in the 2003 election, and highlights the extent of Brown's influence.  Brown's order was followed even though he had no lawful authority with respect to the 2002 general election.

[44]    By statute in Mississippi,
The executive committee of each county, in the case of a primary election, or the commissioners of election of each county, in the case of all other elections, in conjunction with the circuit clerk, shall sponsor and conduct, not less than five (5) days prior to each election, training sessions to instruct managers as to their duties in the proper administration of the election and the operation of the polling place.  No manager shall serve in any election unless he has received such instructions once during the twelve (12) months immediately preceding the date upon which such election is held. . . .  Persons who will serve as poll

testified that they received poll worker training prior to the election and understood from this training that although the final decision with respect to challenges is up to the poll managers, candidates or their poll watchers are entitled to make challenges to ballots.  Gilkey said, for example, that it was his understanding that poll watchers are allowed to point out that signatures do not match.  Moreover, Sue Sautermeister testified that for eleven years, she has been an instructor for the Election Commissioners Association of Mississippi (ECAM) and the Secretary of State's office, which provide the training for local executive committees (including NDEC) as to proper election procedures.  She explained that it has always been part of the instruction that candidates have the right to challenge absentee ballots for sufficiency, which means they have the right to let the managers know when a signature does not correspond or the information is insufficient in some way.

Given that the NDEC receives training from the State that candidates have the right to make these challenges, and that poll workers are, in turn, so trained, it is disingenuous for defendants to now claim that no such right exists.  Whether it

---

watchers for candidates and political parties, as well as members of the general public, shall be allowed to attend the sessions.
Miss. Code Ann. § 23-15-239.

does or not,[45] it is clear that this argument is offered by defendants as nothing more than an after-the-fact justification for their actions.  The court has no doubt that at the time of the August 2003 election, Brown and the members of the NDEC and the poll workers trained at their instance, knew or at least believed such a right existed, and yet proceeded in complete disregard of that right.

Finally, the purpose of absentee ballot work done by Brown and his people on the front end was to stack the deck in favor of the candidates supported by Brown (all black) so when the time came to count the ballots, Brown and members of the NDEC would have considered it to the likely benefit of the Brown-preferred candidates that all the ballots be counted.[46]  The court therefore does not consider the fact that white and black candidates were equally prevented from challenging ballots to be probative.[47]

---

[45]     Consistent with the relevant statutes as described in Sautermeister's testimony, the court is persuaded this right does exist.

[46]     The evidence indicated that the notaries working for Brown collected absentee ballots exclusively within the black community; and Dr. Arrington testified since Brown usually opposes the candidates favored by white voters, then to the extent his efforts through these notaries resulted in absentee ballots that were either fraudulently cast or where the notaries may have actually voted for the person rather than simply delivering the persons' ballot, those activities would bring in additional votes to candidates that Brown favors and would therefore work against the interests of white voters who tend to favor other candidates.

[47]     Defendants point to tally reports from each of the precincts which show that for the 2003 primary, only fifteen

In addition to evidence as to the manner in which the process was run, the Government offered evidence that in a number of instances in the August 26 runoff, absentee ballots of white voters were rejected when absentee ballots of black voters with the same deficiencies were accepted and counted. Some of the rejected white voters' ballots were ballots on which Brown had himself placed yellow post-it notes identifying a reason for rejection. The number of ballots with these yellow stickies was not established (the highest estimate was twenty), but witnesses who saw the yellow stickies (other than Brown) maintained that every stickie seen was on the ballot of a white voter. The Government submits that a racial purpose is the only reasonable conclusion to be drawn from the evidence of such disparate treatment.

Regarding the yellow stickies placed on ballots by Brown during the August 26 runoff between Johnny Kemp and Bruce Brooks,

---

absentee ballots were rejected, of which only two were cast by white voters. The court is dubious of the accuracy of records maintained by defendants; but the fact that only fifteen ballots were rejected out of over 1,200 cast rather confirms the Government's point that there was little actual scrutiny of ballots.

Defendants further point out that Samuel Heard, Jr., filed suit to overturn the election for sheriff and that the tribunal, after reviewing over of 400 of the 1,226 absentee ballots cast, found only 33 had a "material departures" from the applicable law, "a mere 2.7%." The court would agree this rate is low, but also realizes that there were likely additional problems with ballots that scrutiny would not have revealed, such as a voter's ineligibility to vote absentee, or a notary's having marked the ballot rather than the voter.

though Dr. Arrington maintained this was impermissible, the court
is aware of nothing in the law that would specifically have
prohibited Brown's placing yellow stickies on ballots that he
perceived to have defects.  However, the law does give poll
managers the responsibility for determining whether or not a
ballot is to be counted and Brown had no legitimate role in the
process.  Moreover, given Brown's position that his only purpose
was to point out obvious defects to the poll workers, one must
question why he would have bothered.  Presumably the poll managers
themselves would have been qualified by their training to identify
obvious defects.  Further, while Brown insists he was merely
making suggestions to the poll managers and that he made clear to
them that the decision was theirs to make, it is manifest that, in
yet another example of Brown's exerting his influence and control
over the process, Brown's "suggestions" were both intended by him
and perceived by the poll managers as directions, and the ballots
with the yellow stickies were rejected.  Finally, while Brown
claims that he put stickies on the ballots without regard to race,
i.e., they were on both black and white voters' ballots, he was
unable to identify a single black voter's ballot that had been
marked by him for rejection.  The evidence did establish that
ballots of black voters with defects similar to those of white
voters with yellow stickies were not marked by Brown for rejection
and were counted.  For example, the ballot of white voter Charles

Bryant Cooper had a yellow stickie on it indicating it should be rejected because he did not sign entirely on the line for "signature of voter"; yet Johnny Will Thomas, Larry Williams and Alberta Harper, all black voters, signed their ballots the very same way and their ballots were counted.[48]

_____

[48]    The court finds that the evidence relating to the rejection of the ballots of Emily Michelle Cade, Robert Adam Cade, and acceptance of the ballot of Willie Harris Graham, and of the rejection of the ballot of Judge Earnest L. Brown, Sr. and acceptance of the ballot of Emanuel Mallard, Jr., is too uncertain to permit a conclusion that the difference was racially motivated rather than simply being run-of-the-mill mistakes.  The same is true with respect to the ballots of those persons who marked their ballots with an "X".  There could well have been uncertainty among poll workers as to the proper way in which these ballots were to be treated.

Improper Assistance to Black Voters:

In addition to the substantial proof relating to absentee ballot improprieties, the Government presented testimony from several witnesses who related instances of unsolicited and otherwise improper "assistance" being given by black poll workers and other unidentified black individuals to black voters at a number of polling places.  Mississippi law requires that before any voter may be given assistance, the voter must first request such assistance.  See Miss. Code Ann. § 23-15-549 (providing that "[a]ny voter who declares to the managers of the election that he requires assistance to vote by reason of blindness, disability or inability to read or write may be given assistance by a person of the voter's choice other than the voter's employer, or agent of that employer, or officer or agent of the voter's union."); O'Neal v. Simpson, 350 So. 2d 998, 1099 (1977) (before receiving assistance in marking ballot, voter must first make a request for assistance to the managers of the election, and if the managers are satisfied that the voter is either blind, physically disabled, or illiterate and needs assistance, voter may be given assistance).  Annette Hadaway testified that throughout the day of the primary election at the East Macon polling place, she witnessed a number of black individuals approaching black voters, offering them assistance and in some cases actually marking the voters' ballots.  Len Coleman related that black poll workers at

66

the Shuqualak precinct similarly offered assistance to black voters, who usually accepted their assistance.  And Libby Abrams testified that at the Brooksville precinct, she saw black poll workers approaching black voters and offering them unsolicited assistance, which "assistance" consisted of the poll workers taking the ballots and marking them without consulting the voters. Abrams recalled that such assistance was not offered to white voters, and that in fact, when an elderly white voter had difficulty marking her ballot, the poll official offered her no help and instead ran the voter's blank ballot through the machine and thereby denied her the opportunity to cast a ballot.

All but one of the poll workers offered as witnesses by the defense explicitly denied knowledge of any improper assistance having been offered to any voters, and maintained that assistance was given to black and white voters only when requested.  Octavia Stowers testified that the only person she was aware of having given unsolicited assistance was Peggy Brown, a poll watcher for Samuel Heard, Jr.

The testimony of the Government's witnesses, which the court found believable, suggests a concerted effort to illegally "assist" black voters, which could not have occurred without complicity on the part of Brown and the NDEC and the poll workers

they selected and placed in these polling locations.[49]  By law,

poll workers have the authority and responsibility to stop such

patently unlawful activity, and yet that did not occur.[50]

Disparate Treatment of White Candidates at the Polls

The Government claims that Brown and the NDEC disparately

enforced Mississippi's poll campaigning limitations on the basis

of the race of the candidates, and cites this as further evidence

that white voters and the candidates they supported were denied

equal access to the local political process.  Under Mississippi

law, candidates and their representatives are prohibited from

posting or distributing cards, posters or other campaign

---

[49]    There was testimony that Brown himself had engaged in
this type of voter assistance in the 1990s.  Judith Ewing
testified that in 1994, Brown entered the Title 1 poll accompanied
by a black voter; Brown signed the man in, took his ballot, walked
over to the voting booth followed by the man, and started marking
the ballot.  When Ewing confronted Brown, he claimed he was
"assisting" the voter.  Ewing objected that Brown could help the
man mark his ballot, but could not vote the man's ballot for him.
Brown declared that Ewing could not take away the man's
constitutional right to vote.  When Ewing said she was merely
trying to make sure the man was the one doing the voting, Brown
ignored her and put the ballot in the ballot box.  The court has
no doubt this incident occurred as recounted by Ewing.


[50]    The court is highly skeptical of Stowers' testimony
regarding Peggy Brown's alleged activities, especially considering
that Stowers, as a seasoned poll worker, would have known she had
authority to intervene to stop Ms. Brown's actions, and yet took
the position at trial that she thought there was nothing she could
do.  This court has little doubt that Stowers would have known Ms.
Brown's alleged actions were improper and that if she had any
questions about how to handle the situation, she would have asked
someone (probably Ike Brown) what she should do in that situation.

literature within one hundred fifty feet of any entrance of the building wherein any election is being held.  See Miss. Code Ann. § 23-15-895.  Annette Hadaway, the Republican manager at the East Macon precinct for the 2003 primary, testified that some young black people who had been outside of the polling place passing out campaign literature for Sheriff Albert Walker had moved to the back landing of the building.  Hadaway instructed one of the women to move their campaign papers away from the building or they would be thrown away.  Chief Deputy Terry Grassaree, who was an NDEC member at the time, was sitting on the back steps, and immediately jumped up and confronted Hadaway.  He told her not to touch the papers, told her "he [was] the law," and added, "[T]his young lady is not the problem; you're the problem.  You have no business touching her sign or trying to make her move."  About that time, Samuel Heard, Jr. was approaching the building and witnessed the exchange.  When Heard spoke up in defense of Hadaway, Grasseree threatened Heard, stating, "I'll put your ass in jail."  On the same day, however, Grasseree ordered three people who were passing out campaign literature on the courthouse lawn for Heard to leave the courthouse lawn because they were in violation of the 150-foot anti-campaigning rule.

     Grasseree's conduct toward Hadaway and Heard was an egregious abuse of his authority as a law enforcement officer and as a member of the NDEC, and is troublesome, to say the least.  His

motivation for such disparate treatment of these two candidates was doubtless in part the preservation of his job as an employee of the incumbent Sheriff Walker, a job that would rightly have been at risk under another sheriff, though it is not unlikely that race was a factor too.

In another incident cited by the Government as evidence of disparate treatment of white candidates, on the day of the 2003 primary, as Eddie Coleman was approaching the Shuqualak poll to vote, Brown confronted him and in a loud voice, ordered him to get away from the entrance to the building.  When Coleman refused, Brown summoned law enforcement, and Terry Grasseree appeared. Ultimately, Coleman was allowed to enter the building.  Under Mississippi law, the only persons allowed within thirty feet of the polling place are voters, poll workers and no more than two poll watchers for each candidate.  See Miss. Code Ann. § 23-15-245.  Given that Coleman had the absolute right to enter the building to cast his vote, he was not in violation of either the thirty-foot or 150-foot prohibition.  Brown has claimed that at the time of this incident, he did not know whether Coleman had voted and he thus could have mistakenly believed Coleman was in violation of the thirty-foot rule.  Any fair-minded person,

however, would have inquired before ordering him to leave, and certainly before calling for law enforcement.[51]

    Party Loyalty Issues:

    Throughout his political life, Brown has been a Democrat, though prior to becoming NDEC chairman, he considered it his personal prerogative as a voter to support any candidate he wanted, without regard to party affiliation.  He admitted that he had occasionally supported and voted for Republicans.  However, since becoming NDEC chairman, Brown has become more of a "dyed in the wool" Democrat, supporting and voting the tickets of the local, state and national Democratic party.  He testified that one factor contributing to his heightened sense of party loyalty was the fact that he had become a party leader, which he believed naturally imposed on him a higher standard.  However, as told by Brown, what most galvanized him as a true Democrat was the 2000 presidential election in which he contends the Republicans "stole" the presidency from the Democrats.

_____

    [51]    Another example of Brown's asserting himself inappropriately was described in testimony by Libby Abrams. During discussions over the number of poll workers Heard would be allowed at the Brooksville precinct, Abrams spoke with Brown on the phone, and repeatedly tried to explain her position that Heard had the right to have one poll watcher per table.  Brown refused to listen, and finally told her, "I said you can only have one," and "This isn't Mississippi state law you're dealing with.  This is Ike Brown's law."  When Ms. Abrams told him they still planned to have four poll watchers, Brown said, "Fine, fine, have as many as you want.  I'll send the police on around to arrest you."

Subsequently, after former Democrat Lieutenant Governor Amy Tuck switched to the Republican party mid-term in December 2002, Brown began to vigorously advocate establishing a standard of party loyalty, and maintained that he should and could insist on requiring declarations of party loyalty on the part of candidates who would seek to run as Democrats in Noxubee County. State Democratic Party Chair Rickey Cole confirmed that while Brown was not alone in demanding implementation of a party loyalty standard, he was perhaps the most adamant and outspoken on the issue. It was well known that Brown was outraged by Tuck's actions and believed that party rules regarding party loyalty should be enforced.

Brown first addressed the issue publicly in a letter published in the January 2, 2003 edition of the *Macon Beacon*, in which he wrote:

> An open letter to the Democratic voters from Ike Brown, the chairman of the Noxubee County Democratic Executive Committee.
> As a result of the recent switch by Amy Tuck to the Republican part after years of masquerading as a Democrat. And also due to a recent Supreme Court ruling, we will root out disloyal Democratic elected officials and voters. To paraphrase a cousin of mine, you won't be able to run with the hares and back with the hounds. The following actions are going to be taken this year.
> 1 – Republican-supporting officials will not be certified to run as Democrats. This includes two members of the board of supervisors and some countywide officials. They may wish to run as a Republican or Independent but will not be allowed as Democrats.

> 2 – Those voters who are Republicans will be challenged
> if they attempt to vote in the Democratic primary.  (We
> have found out who they are).

A week later, the *Beacon* carried a story headlined "Dem Chairman Says Some Candidates Won't Qualify," in which Brown was quoted at a meeting of the Board of Supervisors saying that his committee would not certify candidates who had not been faithful Democrats, and that among the unfaithful were two members of the Board of Supervisors and one countywide official.  Brown was quoted as saying, "We encourage any candidate who thinks they might be in trouble to qualify as an Independent or a Republican and take their chances in the General Election."

It is uncontroverted that in December 2002 and continuing into 2003, Tuck's defection and the issue of party loyalty was very much on the minds of Democratic party officials; it was also an issue high on Ike Brown's agenda, as evidenced by his letter to the *Macon Beacon* and comments to the Board of Supervisors.  In the midst of this discussion and debate within the party, Samuel Heard, Jr. filed papers to qualify to run on the Democratic ticket for sheriff of Noxubee County.  In January or February 2003, as Heard was leaving the circuit clerk's office, Ike Brown followed him into the foyer, and in a loud voice, told Heard, "You know I'm not going to let you run as a Democrat because you know what you are."  Heard took this to mean that he was "a white Republican."

Brown did not follow through on this threat; nothing further was said and Heard ran as a Democrat.

In June of 2003, as the election drew closer, Brown sent a press release to the *Beacon* with the list of the names of 174 voters, of whom Brown was quoted as saying:

> "They have either removed themselves from their precinct or are in violation of Section 23-15-575.
>
> That Code Section says voters who participate in primary elections must support the party nominees in the general election.

Brown was reported as saying those voters might be challenged under the authority of Miss. Code Ann. § 23-15-575 if they attempted to vote in the Democratic primary.[52]   The majority of the 174 voters listed were from District 4, the home of Supervisor Eddie Coleman, and the rest were from District 1, Larry Tate's home district.

In the end, Brown did not challenge any voter.  Once his press release was published, controversy immediately erupted which prompted State Party Chairman Rickey Cole to seek an opinion from the Mississippi Attorney General as to the enforceability of § 23-15-575 by way of challenges to voters.[53]

---

[52]    That statute states:
No person shall be eligible to participate in any primary election unless he intends to support the nominations made in the primary in which he participates.

[53]The Attorney General responded, in part:
[W]e preface our responses to your questions by noting

<u>The Attorney General</u> responded with an opinion, strongly

> that it is a crime for a poll worker or other persons to deprive one of his suffrage or to refuse the vote of a qualified elector without honestly considering his qualifications.  See Mississippi Code Annotated, Sections 97-13-19 and 97-13-33 (Revised 2000).  We further note that Section 23-15-241 requires the election bailiff to insure that all qualified electors have "unobstructed access to the polls."  Therefore, voters must not be delayed by anyone as they approach the polls.
> . . .
> [W]e find nothing that would allow a poll worker, poll watcher or another voter to ask a voter if he or she intends to support the nominees of the party once the voter presents himself or herself to vote.  Challenges may be made pursuant to Section 23-15-579 only for the reasons listed in Section 23-15-571, and for the reason that the voter does not intend to support the nominees of the party per Section 23-15-575.
> . . .
> If a challenge of a voter is properly initiated in strict accordance with Section 23-15-579 and the voter then openly declares that he or she does not intend to support the nominees of the party, the poll workers could find the challenge to be well taken and mark the ballot "challenged" or "rejected" consistent with the provisions of said statute.  On the other hand, if the voter openly declares his or her intent to support the nominees, then a challenge is not proper under Section 23-15-575.
> . . .
> [A]bsent an obvious factual situation such as an independent candidate attempting to vote in a party's primary, the stated intent of the voter is controlling. MS AG Op. Hemphill, (January 16, 2003). No past action by a voter can form the basis of a valid challenge under Section 23-15-571(3)(g) and Section 23-15-575.
> . . .

<u>Cole Opinion</u>, 2003 WL 21962318 (Miss. A.G. July 21, 2003).  The Attorney General further wrote that he had been informed by the Department of Justice that "challenging a person's right to vote based on his or her alleged lack of support of party nominees pursuant to Section 23-15-575 would be viewed as a change in practice that requires pre-clearance pursuant to Section 5 of the Voting Rights Act."  <u>Id</u>.

cautioning against challenging voters under Mississippi Code Annotated § 23-15-575.  Nevertheless, there was testimony that as a result of the publication of this letter, several persons telephoned the circuit clerk's office expressing concern they would be challenged; one voter felt intimidated and took her husband with her to the poll; and another testified that she did not go to vote because she feared she would be challenged.

The Government contends that Brown's putative insistence on party loyalty was nothing more than pretext for race discrimination, and that his actions were a racially discriminatory attempt to disqualify voters and candidates from participating in the Democratic primary.  Brown, on the other hand, claims that this had nothing to do with race and everything to do with partisanship.

In the court's opinion, Brown's remarks to Heard must be viewed in the context of the larger debate that was ongoing within the party concerning a party loyalty standard.  Although Heard has maintained that he is and has always been a Democrat and the court has no reason to conclude otherwise, it is undisputed that Heard's father had been heavily involved in the Republican party for decades, and Heard's brother, Keith Heard, had run for Congress on the Republican ticket against Chip Pickering.  Thus, while Brown's conclusion that Heard was not a true Democrat may have been wrong, the court is nevertheless persuaded that Brown did perceive Heard

as a Republican masquerading as a Democrat and that his comment to
Heard was not about race but rather about party.

The text of Brown's letter tends to confirm this.  Brown
vowed to "root out disloyal Democratic elected officials and
voters," including, among others, "two members of the board of
supervisors."  It is reasonably clear from the evidence the one of
the two members of the Board of Supervisors to whom Brown was
referring was black board member Larry Tate, who was known to have
angered Brown by supporting Chip Pickering and Thad Cochran.

It is not as clear to the court that partisanship was Brown's
motivation, or at least his sole motivation, for publishing the
names of the 174 persons who might be challenged if they attempted
to vote in the Democratic primary.[54]  Each of the 174 voters he
identified is white; but since virtually everyone in Noxubee
County who might be considered Republican is white (perhaps with
the exception of Larry Tate, at least as Brown saw it), any list
of Republicans would necessarily be a list of whites.  All the
witnesses agreed, if you are challenging Republican voters in
Noxubee County, you are by definition challenging white voters in

---

[54]    "Racial discrimination need only be one purpose, and not
even a primary purpose, of an official act in order for a
violation of the Fourteenth and the Fifteenth Amendments to occur.
We see no reason why under the amended Voting Rights Act of 1982
this would not be even more so."  Velasquez v. City of Abilene,
Tex., 725 F.2d 1017, 1022 (5th Cir. 1984) (citing Arlington Heights
v. Metropolitan Housing Corp., 429 U.S. 252, 265, 97 S. Ct. 555,
563 (1977)).

Noxubee County.  However, while all Republicans in Noxubee County are white, all whites are not Republicans.

In Noxubee County, there are few Republican candidates and few voters who vote in the Republican primary; and those who do vote Republican are white.  Approximately twenty percent of voters in the Democratic primary are white, yet it is widely known that many of those who vote in the Democratic primary (presumably white) vote the Republican ticket in the November general election.  That is why the Democratic primary, in local elections at least, is for all practical purposes the real election in this county.  Thus, although there is no "party-raiding" occurring in Noxubee County since there are so few Republican candidates, the court acknowledges the legitimacy of party concerns over non-Democrats voting in the Democratic primary and thereby subverting the will of the true Democrats, i.e., those who support the policies and principles of the Democratic party.  <u>See</u> Democratic Const. Art. III, §§ 1, 3 (providing that membership in the Democratic Party is open to "all qualified Mississippi electors who profess to support the principles of the Democratic Party").[55]

---

[55]    Prompted in part by the Attorney General's response to Cole's inquiry, the State Democratic Party filed suit in federal court in the Northern District of Mississippi in January 2006 arguing that "the current primary system in Mississippi is unconstitutional because without party registration or any other way to enforce § 23-15-575, the Democrats have no mechanism to prevent non-Democrats from voting in their primaries thereby allowing the possibility of party-raiding- i.e., when dedicated members of one party vote in the primary of an opposing party in

The question is whether Brown's action with respect to this list of 174 voters was actuated by these party loyalty concerns or whether this was pretext for a true purpose to discourage white voters from coming to the polls, or some combination of the two. The court has carefully weighed the evidence and finds that while party concerns were a factor in Brown's actions, race played a role as well.

If concerns over party loyalty had been the sole impetus for Brown's actions, Brown should have been able to articulate a basis for his decision to include each voter whose name was included on

---

order to alter the outcome of the primary in favor of their own party's candidate in the resulting general election." <u>Mississippi State Democratic Party v. Barbour</u>, 2007 WL 1687467, *1 (N.D. Miss. 2007). In a ruling issued June 8, 2007, Judge Allen Pepper concluded that "[s]ince the State of Mississippi does not have mandatory party registration, . . . and . . . does not have mandatory voter identification for all primary elections in order to verify that the voter in question is in fact a member of the subject party, there is no practical way to enforce § 23-15-575." <u>Id</u>. at 18. The court held that "the primary system currently in place in Mississippi violates the Mississippi Democratic Party's First Amendment right to disassociate itself from those who are not in fact affiliates of the Mississippi Democratic Party in Democratic primaries because there is no mechanism in place for the political parties in Mississippi to verify the party affiliation of the prospective primary voter," <u>id</u>., and ordered that "to correct this constitutional problem, the State of Mississippi can either (1) keep Miss. Code Ann. § 23-15-575, require mandatory party registration (with the option for a voter to designate him or herself as unaffiliated) and voter photo identification for all primary elections, and consider the option of authorizing the parties to allow unaffiliated voters to vote in their primaries but not registered members of an opposing party; or (2) the State can fashion some other form of primary system that does not infringe on political parties' right to disassociate opposing-party members from possible party-raiding." <u>Id.</u>

the list on account of such alleged concerns; yet Brown was only able to identify a few specific persons for whom he had any concrete basis for suspecting they were not true Democrats.  Those included the current and past chairwomen of the Noxubee County Republican Party; and he vaguely suggested that some he recognized as having voted in Republican primaries in the past or having contributed to Republican candidates.  For most, however, no explanation for their inclusion was provided, and he was not able to identify any investigation that was undertaken prior to publishing these names.  Moreover, although the article recited that the majority of the voters on his list "[f]ell into the party loyalty category," others were supposedly included because they had "removed themselves from their precinct."  Brown claimed to have believed that the voter rolls in Noxubee County included some nearly 2,000 voters who had either moved or died, and thus, some of those 174 were thought to be among those voters.  Yet is not credible in the least that Brown was only aware of whites who had moved and were consequently no longer eligible to vote.  Finally, it was not disputed that the majority of voters included in the list were from supervisor District 4, that of the lone white incumbent.

In sum, the court is of the opinion that Brown had the names of these white voters published in part because of party loyalty

concerns, but also as an attempt to discourage white voters from voting in the 2003 Democratic primary.[56]

The Precinct Caucuses:

Brown's handling of the 2004 precinct caucuses represents in the court's view one of the most blatant abuses of Brown's position as chairman.  The evidence established that at Brown's direction, five of the Democratic Party's precinct caucuses for Noxubee County in the spring of 2004 were held in private homes or businesses;[57] and Brown intentionally kept the location of these caucuses secret from all but a limited number of his supporters/followers, all black, and, as a result of the clandestine nature of these "private" caucuses, a number of whites

_____

[56]   The Government contends that Brown's public "threat" to challenge persons on the list of 174 white voters if they attempted to vote in the 2003 Democratic primary violates Section 11(b) of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973i(b), which prohibits anyone from intimidating, threatening or coercing any person from attempting to vote.
Although the court does conclude that there was a racial element to Brown's publication of this list, the court does not view the publication as the kind of threat or intimidation that was envisioned or covered by Section 11(b).  Cf. U.S. v. McLeod, 385 F.2d 734, 741 (5th Cir. 1967) (trial court erred in failing to find that acts of county officials in arresting and prosecuting various persons intimidated and coerced prospective black voters).  The court notes, too, that the Government has given little attention to this claim, and states that it has found no case in which plaintiffs have prevailed under this section.

[57]   The Brooksville precinct caucus was held at the home of Catherine Johnson; the High School precinct caucus was held at Ike Brown's home; the West Macon caucus was held at the home of Theotis and Sandra Rice; the Shuqualak caucus was held at the Beehive, a local business establishment; and the caucus for the Title 1 precinct was held at the home of Lucille Hatcher.

81

who tried to attend and participate in the caucuses were thwarted in their efforts.[58]  These private caucuses were attended exclusively by blacks, and the delegates elected at these caucuses, many of whom were not even present for the caucuses and were not even aware they had been elected, were black.[59]

It is abundantly clear that there was no arguably legitimate reason for these caucuses to be held at any location other than the usual polling places.  That is where all caucuses had always been held.  It was also the explicit intent and directive of the State Democratic Party that caucuses be held at the "usual polling places whenever possible," and there was no reason the caucuses could not have been held at the usual polling places.[60]  What

---

[58]    Prior to the caucuses, the *Macon Beacon* reported the date and time the caucuses were to be held, and indicated they would be held "at their county voting precincts."  Scott Boyd, editor, testified that he had asked Brown where the party caucuses would be held, but Brown would not tell him anything; Brown just gave his phone number and said if anybody had questions, they could call him.

[59]    Boyd testified that he attempted to interview Brown afterwards about these caucuses, and that Brown would not release the names of the delegates chosen at the caucuses.  In response to criticism of the way the caucuses were held, Brown responded simply that he was county chairman and could do as he wanted.

[60]    Defendants have claimed that the Lottie Smith Center, which is the polling place for the Brooksville precinct, was unavailable due to a funeral luncheon having been scheduled for that day.  The evidence belies this claim.  Not only was there no funeral luncheon or any other kind of activity at the Lottie Smith Center on that date, but Ike Brown had actually telephoned Catherine Johnson a week or two before the caucus date and asked to use her home for the caucus.  Brown could not have anticipated in advance that the Lottie Smith Center would be unavailable due

prompted Brown to hold these private caucuses is clear:  His
position as NDEC chairman was threatened and he wanted to maintain
that position.

     The evidence at trial showed that in the wake of the 2003
primaries, a movement was begun by a group of Democrats in Noxubee
County, primarily black, to oust Brown from the chairmanship of
the NDEC.  This anti-Brown faction was led by John Gibson and
Larry Tate, both black.  Gibson and Tate had asked persons, both
black and white, whom they believed would support them to attend
the caucuses so they could elect delegates to the county
convention who would vote to unseat Brown.

     Samuel Heard testified that his experiences during the 2003
primary showed him how important it was to try to make a change in
Democratic party leadership.  He was aware there was a group that
was interested in a change of chairmanship of the NDEC and he
wanted to go to the caucus so that he could vote to elect
delegates who would attempt to defeat Brown in any bid for
reelection to be chairman.  Heard stated he was unable to attend
the caucus because when he arrived at the Lottie Smith Center on
the day of the caucus, the doors were locked and no one was there.

---

to a funeral luncheon.  Moreover, Brown made clear in his
testimony that the question of availability of any polling place
was not an issue, and that he did not bother to determine
availability, because as the Democratic chairman, he "had the
authority to set the sites, and that's where he chose to set the
sites."

He complained he was unable to attend the caucus because he did not know where it was being held.

Johnny Kemp, who had run unsuccessfully for the Board of Supervisors in the 2003 primary, also tried to attend the caucus for the Brooksville precinct because he wanted to "try to get us some good delegates elected and get us some good people that we felt would run fair elections in Noxubee County." But when he went to the Lottie Smith Center, he, too, found it locked and no one present. He testified, however, that the person he had wanted to try to get elected did find out where the caucus was and went to the caucus and got elected as a delegate.

Phillip McGuire, chairman of the Macon Democratic Executive Committee, testified that there had been talk in the county about a movement, which he assumed to be among some of the black Democrats, to get new leadership on the county level. McGuire supported this movement and wanted to be more involved, and to be elected as a delegate and to attend the county convention; but he was not able to get elected, he stated, because he never got an opportunity to caucus. When he went to the B.F. Liddell Middle School, the polling place for the High School precinct, the doors were open but no one was there and no member of the NDEC showed up to conduct a caucus. The High School precinct caucus was held at Ike Brown's home, and was attended only by blacks.

In three of the five precincts in which Brown and his
followers held private caucuses, the Gibson faction held duplicate
caucuses, and elected delegates to the county convention.[61]  At the
March 13, 2004 county convention which followed, chaos prevailed.
After Brown appointed himself temporary chair of the convention, a
vote was held for a permanent chair; Brown received 22 votes and
Betty Robinson was elected temporary chair with 39 votes.  Brown
then attempted to adjourn the convention, claiming this was his
prerogative as NDEC chairman, and he left.  Those who remained
elected delegates to the state convention, but failed to elect
members of an executive committee.  The controversy over who was
the legitimate representative of the Democratic Party in Noxubee
County was brought before the State Democratic Party for
resolution;[62] and although the State Party began looking into the
matter, it has never taken any action to finally resolve the

--------

[61]    Under the rules of the State Democratic Party, a caucus
may be held by anyone who arrives at the caucus location, and the
caucus may elect delegates to the county convention.  Thus, those
who were aware of the proper procedure were able to take part in a
caucus.

[62]    Before the county convention, complaints were made to
the State Democratic Party by a number of persons, including
Chancery Clerk Mary Shelton, who made a formal protest and sought
instructions as to what steps should be taken to rectify the
situation.
     Additional complaints were made following the convention.
One such complaint was made by Betty Robinson, who wrote to Rickey
Cole that she had been elected chair and requested that Cole
"inform Mr. Brown . . . that he must dismantle his clandestine
attempt to disrupt the Noxubee County democratic process. . . ."

issue, apparently because Brown represented (or misrepresented) to State Democratic Party Chairman Rickey Cole that his group and the Gibson faction had worked out a power-sharing arrangement of sorts.[63]   Throughout this time, Brown has maintained that he remains the rightful chairman of the NDEC.

It is apparent to the court that Brown's singular purpose in all of these events was to retain his position and power as chairman of the NDEC, and to do so by whatever means were necessary, namely, connivance, manipulation and prevarication.[64] His actions are properly to be condemned, and in the court's view, the State Democratic Party was remiss in failing to take action to rectify his abuses.  However, while Brown's actions impeded the efforts of at least a few white persons to attend the caucuses, his intent, in the court's opinion, was to thwart the Gibson faction's move to take control of the party from him.  His intent was not to exclude whites, but to exclude Gibson's supporters,

_____

[63]   The court would note that Brown blatantly misrepresented the facts to the State Party, advising that there had been only one caucus held at a private residence.  Brown claimed at trial that he did not misrepresent any facts; he just did not give the State Party all the facts because he did not see it as his job to make the other side's case for them.  No matter how he may wish to characterize his actions, what he did, under any reasonable person's understanding of the concept, was misrepresent the facts.

[64]   This is the same conclusion reached by Dr. Arrington, a conclusion deemed "outrageous" by defendants, but the court comes to its view of Brown's actions based on its independent review of the facts.

both black and white.  Cf. Welch, 592 F. Supp. 1549 (finding that
irregularities, errors and fraud in distribution and counting of
absentee ballots did not violate Section 2 where there was no
evidence that such infractions were motivated by racially
discriminatory intent or that blacks, as opposed to supporters of
the black candidate, suffered dilution of their votes).

        Conclusions of Law:

        Defendants view the Government's use of the Voting Rights Act
in this case as a perversion of the Act's historical and salutary
purpose to "eradicate inequalities in political opportunities that
exist due to the vestigial effects of past purposeful
discrimination" against blacks.  Gingles, 478 U.S. at 44, 106 S.
Ct. at 2763 (citations omitted).  As a matter of principle,
defendants proclaim it "preposterous" that the Justice Department
-- a Justice Department they maintain has for decades been wholly
unresponsive to complaints of voting discrimination by black
citizens -- would have the temerity to come into this court
claiming that blacks in Noxubee County, who were oppressed by the
white establishment for 135 years and who finally gained the reins
of power a mere 12 years ago, have discriminated against whites in
that county.  As defendants see it, this is a case of the
Government "persecuting the victim for fighting back when a crime

has been committed against him" after the Government refused to protect the victim.[65]  They declare:

> The Government sues for a group of Noxubee County whites who (1) have endured no history of official discrimination, but have enjoyed privileged status, (2) have not been under-represented or unable to elect candidates of their choice, (3) have not had to bear the effects of discrimination in education, employment and health, (4) have not been subject to an unresponsive government, and (5) have not been subject to any practice that enhances the opportunity for discrimination against them.

Section 2, they argue, "is being launched as a missile without an enemy."  There is no "practice" that has denied whites equality in participation in the political process, they contend, and so, with no practice to attack, the Government has resorted to attacking Democratic Party leadership, an attack they insist cannot be maintained under the authority of Section 2.  Beyond that, defendants deny there has been any kind of fraudulent or wrongful conduct, or any showing of any violation of state election laws,

---

[65]     Defendants purport to find this lawsuit especially appalling based on their perception that the Justice Department for decades ignored complaints by blacks of voting discrimination against them by whites.  The Government flatly denies that it has been unresponsive to such complaints by black voters and maintains that it investigates every complaint it receives.  This court cannot be certain one way or the other as to whether or not the Government has satisfied its obligations with respect to reports of voting discrimination by black voters.  But even if it may not have been as responsive as defendants believe it should have been, this court cannot overlook a proven violation of Section 2 against white voters on the basis that the Government may have failed to press the rights of black voters.

but rather the kind of run-of-the-mill mistakes that occur in any election.

For Section 2 to apply, the challenged situation must constitute a qualification, prerequisite, standard, practice or procedure within the meaning of Section 2. See United States v. Jones, 57 F.3d at 1023. In Welch v. McKenzie, 492 F. Supp. 1549 (S.D. Miss. 1984), relied on by defendants, the losing black candidate in a race for supervisor of Copiah County sued under Section 2, claiming that illegal absentee ballots had been improperly counted. The district court reviewed the evidence and found that "[w]hile irregularities [were] apparent, these [did] not constitute 'episodic' events in the sense that they [were] part of an over-all scheme or pattern. Rather, these were isolated and singular incidences of misconduct and improper administration." Welch, 592 F. Supp. at 1558. According to defendants, the same holds true here. Contrary to defendants' urging, Welch does not provide the "most appropriate guidance" for this court's resolution of this case.

In Welch, while there were infractions, the district court found there was no evidence that racially discriminatory intent motivated those infractions or that there was otherwise any racial element involved. The court found that while the procedures used by the registrar's office in the handling of absentee ballots were contrary to Mississippi law, the problems arose because the

89

registrar and her office were unknowledgeable as to the proper
procedures; they had not been "intentionally active in seeking to
defraud the black voters of Copiah County and the (black)
candidate Welch."  Id. at 1557.  Moreover, the notary public
involved for the challenged ballots had done nothing other than
attempt "to render a service to those voters who wished to vote by
absentee ballot" and had sought advice from the registrar's office
as to the proper manner for handling absentee ballots.  Id.  The
poll managers made mistakes with respect to the ballots simply
because "[t]hey had not been adequately trained as poll workers
and did not know what the provisions of law were regarding the
challenges to absentee ballots."  Id.  Finally, the Democratic
Executive Committee, comprised of black and white members, failed
to grant relief to the black candidate based on questionable
advice from the Attorney General's office, and did nothing to
"intentionally and purposely violate[] any of the rights" of the
black candidate.  Id.  There was evidence of absentee ballot fraud
by the white candidate, but as he was not a state actor, Section 2
did not extend to his misdeeds.  Id. at 1558.

     On appeal, the Fifth Circuit found the absence of evidence of
any racial component significant.  The court affirmed the lower
court's factual findings, and concluded there was no Section 2
violation, stating, "Without racial motivation or state-created
impairment of black votes, there was no violation of Section 2 of

the Voting Rights Act." <u>Welch</u>, 765 F.2d at 1316.  The court stressed the importance of the lack of proof of a racial element, stating, "If the registrar in this case had supplied absentee ballots only for white voters, or if the Democratic Executive Committee had been an all-white body voting to certify Hood as the winner despite the number of obviously invalid votes cast for him, the district court's finding of no Section 2 violation might have been sorely taxed." <u>Id</u>. (citing <u>Goodloe v. Madison County Bd. of Election Com'rs</u>, 610 F. Supp. 240, 243 (S.D. Miss. 1985)).

In <u>Goodloe</u>, although there was no proof of intent to discriminate, the court found a Section 2 violation where the Board of Election Commissioners threw out 250 ballots notarized by Mildred Branch, virtually all of which had been cast by black voters, where it was presented with proof only that four ballots notarized by Branch had been marked when the notary was not present, in violation of state election laws.  610 F. Supp. at 242.  Faced with an administrative dilemma, the commissioners chose not to undertake an individualized evaluation of each ballot but rather to invalidate all of the ballots notarized by Branch. <u>Id</u>.  The court found there was "no indication that intentional discrimination played any role whatsoever in the decision made by the Board of Election Commissioners," yet because their decision resulted in the effective disenfranchisement of the black voters without any clear indication of whether those votes were cast in

91

accordance with state absentee balloting procedures, the court
found the "series of events leading up to and including the
invalidation of the Branch ballots was a practice within the
meaning of Section 2" which "operated to deny the black voters who
cast these absentee ballots an equal opportunity to participate
and elect candidates of their choice."  Id.

Goodloe involved a one-time response to a specific situation,
and yet was a "practice" because the decision resulted in the
disenfranchisement of minority voters.  A number of cases have
found Section 2 violations in analogous circumstances.  See Toney
v. White, 488 F.2d 310 (5th Cir. 1973) (en banc) (finding Section
2 violation where voting registrar purged black voters for
nonvoting but did not drop similarly situated white voters;
although there was no discriminatory purpose, net result was
discriminatory); Brown v. Post, 279 F. Supp. 60 (W.D. La. 1968)
(finding violation of Section 2 where voting registrar, though
acting in good faith, made absentee ballots available to white
voters without taking equal steps to aid black voters); cf. United
States v. Jones, 57 F.3d 1020, 1024 (11th Cir. 1995) (finding that
an inadvertent error which resulted in officials' unwitting
allowance of out-of-district white voting did not violate Section
2).

As intimated by the court in Welch, a "practice" will also be
found where there has been an intent to discriminate on account of

92

race.  Thus, in <u>Dillard v. Town of North Johns</u>, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989), the court found Section 2 was violated where the mayor intentionally withheld candidacy requirement information and forms from black candidates because of their race. <u>Cf.</u> <u>Operation King's Dream v. Connerly</u>, No. 06-12773, 2006 WL 2514115, 17 (E.D. Mich. Aug. 29, 2006) (although Section 2 applied to "episodic" procurement of signatures on petition for ballot initiative, Section 2 was not violated because those involved "sought to deceive and in fact deceived both minority and non-minority voters in order to obtain their signatures").

In contrast to <u>Welch</u>, there is in this case both racial motivation and state-created impairment of white votes, most particularly with respect to the handling of absentee ballots.[66] The racially discriminatory actions of defendants are thus not isolated or singular instances of misconduct due to their ignorance, as was the case in <u>Welch</u>, but a pattern of episodic behavior intended to deny white voters equal participation in the political process.

On the issue of intent, it is often written that "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as

_____

[66]   The court would note that defendants' arguments to the court are presented in the framework of a "results" claim analysis, and do not account for the Government's claim that all of the defendants' challenged actions were racially motivated and purposefully discriminatory.

may be available.'"  <u>Rogers v. Lodge</u>, 458 U.S. at 618, 102 S. Ct.
at 3276 (citing <u>Arlington Heights</u>, 429 U.S. at 266, 97 S. Ct. at
564).  However, whereas intent to discriminate is often difficult
to prove, defendants, and again Brown in particular, have been
anything but subtle.  Among the factors identified in <u>Arlington
Heights</u> as potentially relevant evidence of intent are statements
reflecting on the purpose of the decision.  Most pertinent to the
court's finding of intentional discrimination against white voters
in this case are the numerous statements by Brown over the years
in which he has consistently and repeatedly declared his racial
agenda.  These statements, together with more slightly veiled
statements suggesting a racial purpose, considered alongside his
actions, and those of his NDEC "allies," provide compelling
evidence of intent.  A second <u>Arlington Heights</u> factor bearing on
intent in this case is evidence of departures from normal
decisionmaking.  It is beyond question from the record in this
cause that Brown and members of the NDEC (and others acting at his
direction) have acted in blatant disregard of party rules and
state election laws when it has served their racial purpose to do
so; yet Brown in particular has doggedly insisted on strict
compliance by others when it does not.

     In light of what the court views as substantial direct and
circumstantial evidence of intent to discriminate in this case,

94

the relevance of the Senate factors may properly be questioned.[67]
See Nevett, 571 F.2d at 221-222 ("Where direct evidence of
discriminatory motive is proffered, a case is easily made, ... as
it is where the circumstantial evidence of racially discriminatory
motivation is so strikingly obvious that no alternative
explanation is plausible.").  Nevertheless, the Senate factors
have been held to bear on intent, and are therefore considered.

     The Fifth Circuit has observed that "[a] history of pervasive
purposeful discrimination may provide strong circumstantial
evidence that the present-day acts of elected officials are
motivated by the same purpose, or by a desire to perpetuate the
effects of that discrimination."  McMillan, 748 F.2d at 1044.
While the Government argues that whites in Noxubee County have
experienced a "recent" history of discrimination, the "history" to
which the Government refers consists of the very practices that it
claims in this cause to be the violation of Section 2.  Defendants
are correct that unlike black citizens, whites in Noxubee County

---

     [67]   Notably, defendants Brown and NDEC assert in their
memoranda that the framework of the Gingles analysis, including
the Senate factors, "is not the proper framework" for analysis in
this case; yet the court is unable to discern from their brief
what they contend is the proper framework.
     The court does agree with the parties that proof of the three
Gingles preconditions applicable to results claims in district
line, e.g., multimember or at-large, is not required here.  See
Mississippi State Chapter, Operation PUSH, Inc. v. Allain, 674 F.
Supp. 1245, 1247 (N.D. Miss. 1987), aff'd sub nom., Mississippi
State Chapter, Operation Push, Inc. v. Mabus, 932 F.2d 400 (5th
Cir. 1991).

have not experienced and do not bear the effects of a history of
past purposeful official discrimination in such areas as
education, employment and health, which hinder their ability to
participate effectively in the political process.[68]  Nor, in the
court's opinion, are there in place voting procedures which tend
to enhance the opportunity of discrimination against whites (other
than those that are the subject of the Government's complaint in
this cause).  There is no claim or proof that elected officials
have been unresponsive to white citizens.  And while the
Government contends otherwise, there is scant evidence of a
candidate slating process.[69]

_____

[68]    As defendants note, it is blacks, not whites, who were
the historical victims of discrimination and who continue to
suffer the effects of that past purposeful discrimination.
Indeed, both the history of discrimination against blacks and its
effects are well established.  That history has been recounted
numerous times, and will not be repeated here.  Further, the
record discloses manifest socio-economic disparity between the
races in Noxubee County in all areas.  According to the 2000
Census data, the median household income for black families in
Noxubee County was $16,690; for white families $35,543.  Of
residents aged 25 and older, only 51.4% of the black population
had a high school diploma, compared to 71% of the white
population.  Blacks aged 25 years and older only comprised 36.6%
of the total population with a bachelor's degree, as compared to
whites, who comprised 63%.  The percentage of black families below
the poverty level was 89%, while for white families it was 9%.

[69]    "In jurisdictions where there is an influential official
or unofficial slating organization, the ability of minorities to
participate in that slating organization and to receive
endorsement may be of paramount enforcement."  Marengo County
Com'n, 731 F.2d at 1569.  Here, in addition to the 1995 letter
sent from Brown in prison, the Government attempted to show that
Brown endorsed a slate of candidates for the 2003 primary based on
evidence that Samuel Heard saw a man passing out a sample ballot

As for racial appeals, defendants have sought to minimize the extent of racial appeals by Brown and others, but there is ample evidence that racial appeals are rather standard in Noxubee County. Black officials routinely urge black voters to "stick together," and encourage voting along racial lines by appealing to racial prejudice. In addition to proof of Brown's letter in the *Macon Beacon* claiming Eddie Coleman had engaged in discriminatory road paving practices, the Government offered evidence of public racial appeals by others, including a statement by Justice Court Judge Dirk Dickson at a NAACP candidates forum, stating that in voting, "blacks need to stick together," a statement by the President of the Mississippi NAACP at a forum before the 2005 Macon city election that black candidates had "taken Shuqualak, the county, and Brooksville ... and now it was time to take the

---

under the auspices of the East Mississippi Voters League, an organization he evidently had founded, and Heard observed Brown stopped in his car and speaking with this man. However, the Government has not proven to the court's satisfaction that Brown or any organization with which he was affiliated was responsible for presenting this ostensible slate of candidates.

City of Macon";[70] and testimony by Larry Tate that one of his

campaign slogans is "blacks need to stick together."[71]

Tenuousness is also manifest, for the practices in which

defendants have engaged have no arguably legitimate purpose.  And

defendants have admitted that voting in Noxubee County is racially

polarized.[72]  The parties have approached the final factor, the

---

[70]   Following the Macon elections in 2001, in which a white, Dorothy Baker-Hines was elected mayor, Brown wrote a letter to the *Macon Beacon* addressing the defeat of black candidate Hatcher, in which he wrote:  "Mr. Bennett, before you celebrate, remember three things: (1) White population is shrinking (deaths and migration); (2) Annexation will bring in scores of Title One blacks; and (3) Overwhelming majority of blacks in Macon voted black.  In other words, it's just a matter of time."  Although Brown claimed in his testimony that the letter was simply a neutral, detached, "middle of the road" political analysis of the election, the letter had a clear racial message: blacks would soon be taking over Macon city government.

[71]   There was also evidence of private racial appeals.  For example, Representative Reecy Dickson went to the home of Peggy Brown, who supported Samuel Heard for sheriff, and told her, "I just [came] to tell you that we don't need a white Sheriff in Noxubee County."  Defendants argue, and the court agrees, that such private comments are not the kind of racial appeals to which the Senate factor is addressed.

[72]   Although the parties agreed that voting in Noxubee County is racially polarized, Dr. Arrington undertook an ecological regression analysis to determine the degree to which voting is racially polarized.  His testimony is summarized as follows: In biracial contests, voting was racially polarized 95% of the time; in races with only black candidates, they were racially polarized 80% of the time; and in all white races, they were polarized about half the time.  Overall, 88% of those election contests were racially polarized.
    In 91% of the biracial contests, whites were racially cohesive, meaning they preferred the white candidates or candidates if there was more than one white running.  In 82% of these biracial contests, the whites were "strategically cohesive"; that is, two-thirds of them voted for the same single candidate.

extent to which members of the minority group have been elected to public office, from completely different perspectives.  The Government points out that currently, only two of twenty-six elected officials in Noxubee Couty (7.7%) are white, notwithstanding that whites constitute 32.5% of the voting age population.  Defendants, on the other hand, declare that this factor should weigh in their favor given that over the last twenty years, whites have tended to be over-represented in Noxubee County.  What they mean, of course, is that some fifteen to twenty years ago, before black voters began fully exercising the franchise, whites held elected office in higher proportion than

---

In black-only contests, whites were strategically cohesive 76% of the time; but when there were only white candidates, they were strategically cohesive half the time.  Overall, whites were strategically cohesive in 78% of the contests analyzed.  Though less than is typically seen when black voters are in the minority, it is nevertheless "plenty strong" to support the conclusion that whites are strategically cohesive.

In biracial contests, the candidates supported by the white voters are defeated 78% of the time.  In black only contests, the white-preferred candidate is defeated 57% of the time.  And in white-only contests (of which only six were analyzed), the white-preferred candidate lost only 17% of the time.  Overall, in 66% of the contests, the white-preferred candidate lost.

In 53 of the 61 election (87%) in which Brown's preferred candidate could be identified, whites preferred a different candidate from that preferred by Brown.  In only eight elections (13%) were they advocating the same candidate.  Those eight elections were unusual, though; in four of them, voting was not racially polarized, as it usually is; and only five of these were biracial contests (two were white-only and one black-only).  To factor out party as a consideration in this analysis, 45 Democratic primaries and nonpartisan judicial elections were analyzed:  in 38 (84%) of these elections, Brown and the white voters preferred different candidates.

99

their voting age population.  What is relevant, in the court's view, is not white voters' historical successes at the polls, but their more recent experience.

Having considered the Senate factors, the court remains convinced that Brown and the NDEC have administered and manipulated the political process in ways specifically intended and designed to impair and impede participation of white voters and to dilute their votes.  As detailed above, defendants engaged in improper, and in some instances fraudulent conduct, and committed blatant violations of state election laws, for the purpose of diluting white voting strength.  Although the extent of the abuses of the absentee ballot processes in Noxubee County by Brown and the NDEC is not known, the court is convinced there have been such abuses, that these abuses have been racially motivated, and that the result of these practices has been an infringement of the rights of white voters.  The court is also persuaded that the result of this discriminatory administration of the voting process is the dilution of white voting strength.  "The right to vote includes the right to have one's ballot counted.  This includes the right to not have one's ballot diluted by the casting of illegal ballots or weighting of one ballot more than another."  Welch, 592 F. Supp. at 1557–1558 (citing Reynolds v. Sims, 377 U.S. 533, 554–55, 84 S. Ct. 1362, 1377–78, 12 L. Ed. 2d 506 (1964)).

Noxubee County Election Commission:

The Government acknowledges that most of the evidence in this case addresses actions by Brown and the NDEC, but asserts there is evidence the Election Commission has been directly involved in some of the "election-related problems" in Noxubee County elections, and that in light of that evidence and because the Election Commission is a necessary party for the issuance of effective injunctive relief in this case, a liability ruling should be made against it as well. The "problem" to which the Government principally refers is the Commission's alleged failure to purge the voter registration roll to eliminate persons who have moved or died and who are thus no longer eligible voters, a failure which the Government maintains increases the opportunity for absentee ballot fraud.[73]   For its part, the Election Commission submits that there is no competent, credible evidence that it has failed in its duty to purge the voter rolls, and that in any event there has been no proof that any omission in that respect has amounted to a violation of Section 2. The court agrees that the Government has not established a Section 2 violation by this defendant, but there remains the question

_____

[73]   It does create the potential for persons to vote under others' names. In fact, Kendrick Slaughter testified that during the 2005 Macon election, he saw Ike Brown outside the door of the precinct talking to a young black lady named Bridgette Brown, and heard him tell her to go in there and vote, to use any name, and that no one was going to say anything. Slaughter reported this incident to the Justice Department.

whether its presence is nonetheless needed in order to afford a complete remedy.  Accordingly, the Election Commission will not be dismissed at this time.

    Conclusion:

    The expansion of Section 2 to eliminate the necessity of proving intent was intended to lessen the burden of proving a violation; proving a discriminatory result is easier than proving a discriminatory intent.  The court thus would agree with defendants that this case is an "awkward fit" for a strictly results standard.  The United States Supreme Court has made it clear that the essence of this Section 2 inquiry is whether the challenged "electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives."  Gingles, 478 U.S. at 47, 106 S. Ct. at 2764.  Such interaction simply does not exist when dealing with the voting rights of historically privileged white voters and who as a group do not suffer the effects of past discrimination.  However, where the proof establishes a specific racial intent by black election officials to disenfranchise white voters, Section 2 applies with ease.  No one could reasonably argue that an election official's racially motivated decision to count the votes of black voters while rejecting those of white voters is discrimination

that cannot be countenanced under any view of Section 2.  In
purpose and in effect, that is what has occurred in this case.

     The court does not doubt that similar discrimination against
blacks continues to occur throughout this state, perhaps
routinely.  And it may be true, though the court makes no judgment
about this, that the Justice Department has not been responsive,
or fully responsive, to complaints by black voters.  But the
politics of the decision to prosecute this case, while foregoing
intervention in other cases cannot be a factor in the court's
decision.[74]  If the same facts were presented to the court on
behalf of the rights of black voters, this court would find that
Section 2 was violated.

     Having now found that defendants Brown and the NDEC violated
Section 2, it is ordered that within thirty days of the issuance
of this ruling on liability issues, the parties are to submit
memoranda addressing what they believe would constitute a curative
remedy in this case.  In addition, attorneys for the parties will
make themselves available at a date and time to be set by the

---

[74]    The court recognizes "one reason the Senate Committee
abandoned the intent test was that 'the Committee ... heard
persuasive testimony that the intent test is unnecessarily
divisive because it involves charges of racism on the part of
individual officials or entire communities.'"  Gingles, 478 U.S.
at 71, 106 S. Ct. 2777 (citations omitted).  Undeniably, what was
sought to be avoided has occurred here; but again, it is this
court's function to decide the case on the facts presented.

court in conference or at a formal hearing to address any remedial
issues.

     SO ORDERED this 29th day of June, 2007.


                       /s/Tom S. Lee
                       UNITED STATES DISTRICT JUDGE